(June 13, 1906.)

## A. T. SPOTSWOOD et al., Respondents, v. J. B. MORRIS, as Administrator, et al., Appellants.

[85 Pac. 1094.]

CONSTITUTIONAL LAW—UNINCORPORATED ASSOCIATIONS AND JOINT STOCK COMPANIES—ARTICLES OF ASSOCIATION—REAL ESTATE—PARTNERSHIP—POWERS OF OFFICERS AND SHAREHOLDERS—LISTING REAL ESTATE FOR SALE WITH AGENTS—PROCURING A PURCHASER.

1. Under the provisions of sections 2 and 16, article 11, of the constitution of Idaho, an unincorporated association or joint stock company may be formed by individuals for the purchase of a single tract of real estate, the title to which may be taken in a trustee, and the articles of agreement of the association may provide that the death of a shareholder shall not result in the dissolution of the association, and may so limit the liability of the association and may provide that either or any of the officers or shareholders shall not sell or dispose of any of the property of the association without the concurrence of the shareholders.

2. Said association does not have or exercise any of the powers or privileges of corporations not possessed by individuals or partnerships.

3. To legally possess or exercise powers or privileges of corporations requires a sovereign grant.

4. Under the common law, joint stock companies are legal, and are not prohibited by the constitution and statutes of this state, provided they do not have or exercise any of the powers or privileges of corporations not possessed by individuals or partnerships.

5. As the constitution of Idaho and the statutes of the state do not prohibit the organization of joint stock associations having transferable stock, and which do not usurp the functions of a corporation nor exercise any of the powers or privileges of corporations not possessed by individuals or partnerships, the common-law rule as to their legality prevails in this state.

6. In the organization of said association there is the absence of the *delectus personae*, which characterizes ordinary partnerships from corporations; and the death of one of its members or the sale of the interest of one of the shareholders does not dissolve it.

7. The limitation of the agency of the members of the association is an incident of such associations, under the common law, resulting from the lack of the right of *delectus personae*, and not an incident of the corporation not possessed by a partnership.

Argument for Appellants.

8. Such an association is a partnership, but not a general partnership wherein one of the partners has plenary power to sell and otherwise dispose of the property of the association or create indebtedness beyond that provided for in the articles of association.

9. While some of the principles of partnership may apply to such associations, they cannot, from the very nature of the organization thereof, be entirely controlled by the legal rules and principles that control ordinary partnerships.

10. *Held,* under said articles of incorporation; the vice-president or secretary have no authority to list the association's real estate with respondents for sale.

11. *Held,* that the respondents failed to show that the shareholders of said association ever authorized the vice-president or secretary to list said real estate for sale with the respondents or ratified the same.

12. *Held,* under the evidence, that respondents did not procure a purchaser for said land.

(Syllabus by the court.)

APPEAL from the District Court of the Second Judicial District for Nez Perce County. Hon. Edgar C. Steele, Judge.

Action to recover commissions for procuring a purchaser for an alleged sale of real estate. Judgment for plaintiffs. *Reversed.*

James E. Babb and Daniel Needham, for Appellants.

The purchaser's attention having first been directed to the land by appellants through a circular describing the same and putting a price thereon, and the purchaser having started from Iowa to see the land because of this circular, and having only accidentally met the plaintiffs on his way to see the appellants and this land, the plaintiffs can have no claim for a commission, since the purchaser was a customer of the appellants and they had a property in him which the plaintiffs could not take from them. (4 Am. & Eng. Ency. of Law, 2d ed., 980; *Bryan v. Albert,* 3 App. Cas. (D. C.) 180; *Loyd v. Matthews,* 51 N. Y. 124; *Sussdorff v. Schmidt,* 55 N. Y.

319; *Burkholder v. Fonner,* 34 Neb. 1, 51 N. W. 293; *Hanford v. Shapter,* 4 Daly (N. Y.), 243.)

Neither Robert Schleicher nor Benjamin F. Morris, nor both of them, had authority under the articles of the Denver Townsite Company to employ the plaintiffs as brokers. (*Willis v. Greiner* (Tex. Civ. App.), 26 S. W. 858.)

(On the question of the status of joint stock associations under the constitution and laws of Idaho, appellants cite the same authorities cited in the decision.)

I. N. Smith, for Respondents.

The defendants here were a partnership—self-styled "joint stock association"—whatever that may be under the Idaho· law. As such they are partners, and the liability of members of a "joint stock company" to third parties is the same as partners. (*Claggett v. Kilbourne,* 1 Black, 346, 17 L. ed. 213; 17 Am. & Eng. Ency. of Law, 2d ed., 636, also 637, note 2; *Carter v. McClure,* 98 Tenn. 109, 60 Am. St. Rep. 842, 38 S. W. 585, 36 L. R. A. 282; *Robinson v. Smith,* 3 Paige, 222; *Allen v. Lang,* 80 Tex. 261, 26 Am. St. Rep. 735, 16 S. W. 43; *Bullard v. Kinney,* 10 Cal. 60; *Butterfield v. Beardsley,* 28 Mich. 412; *Webster v. Clark,* 34 Fla. 637, 43 Am. St. Rep. 217, 16 South. 601, 27 L. R. A. 126; *Spaulding v. Stubbings,* 86 Wis. 255, 39 Am. St. Rep. 888, 56 N. W. 469; *Goldsmith v. Eichold Bros. etc.,* 94 Ala. 116, 33 Am. St. Rep. 97, 10 South. 80.)

Because the defendants were partners the power of one partner to bind the others existed; especially is this so as to Schleicher, because his authority required him to sell these lands.

Schleicher was the trustee of an express trust which required him to sell this land.

The trustee of an express trust has power to employ ·the usual agencies which ordinarily prudent men employ in their own business to carry out the terms of the trust imposed upon him. This extends to the employment of agents to do all things, which do not include the delegation of the discre-

tionary terms of the trust. (Eaton's Equity, sec. 203; Bispham's Principles of Equity, 6th ed., 206; 2 Pomeroy's Equity, sec. 1068; Lewis on Trusts, \*435-\*632; *Tyler v. Herring,* 67 Miss. 169, 19 Am. St. Rep. 263, 8 South, 840.)

A trustee is not bound to do everything himself, and thus, to carry out his trust, he may employ agents.

A trustee employed to sell may employ auctioneer. (*Kennedy v. Dunn,* 58 Cal. 340; *Fogarty v. Sawyer,* 23 Cal. 570; *Gillispie v. Smith,* 29 Ill. 473, 81 Am. Dec. 328; *Hawley v. James,* 5 Paige, 478; *Cranston v. Crane,* 97 Mass. 459, 93 Am. Dec. 106; *Palmer v. Young,* 96 Ga. 246, 51 Am. St. Rep. 136, 22 S. E. 928; *Matter of Pratt,* 119 Cal. 156, 51 Pac. 47; 28 Am. & Eng. Ency. of Law, 2d ed., 990, note 4.)

Joint stock companies are unknown to the laws of Idaho. We have only corporations or partnerships. This being true, and there being no provisions for the recordation of such instruments as these "Articles of Association"—the record thereof was a nullity, was not constructive notice of anything—and was simply an encumbrance on the public records, which should be expunged. (24 Am. & Eng. Ency. of Law, 2d ed., 141.)

Schleicher was held out to the public as the agent with plenary powers of this association. (10 Cyc. 912, note 72.) People dealing with agents of the kind that Schleicher was are not charged with knowledge of secret by-laws. (Morawetz on Corporations, sec. 593.)

The Revised Statutes of Idaho, at section 18, provide that the common law of England, so far as it is not repugnant to or inconsistent with the constitution and laws of the United States, in all cases not provided for in these Revised Statutes, is the rule of decisions in all the courts of this territory. It is reasonable to argue that by this expression is meant the law and statutes of England as they stood at the end of the Revolutionary War. This would include the "Bubble Act," under which all joint stock associations were nuisances, and especially those seeking to exercise the functions of a corporation. (*Browning v. Browning,* 3 N. Mex. 371, 9 Pac. 677.)

Under this decision the "Bubble Act" would be part of the common law of England adopted in Idaho.

The "Bubble Act" declares joint stock associations to be nuisances. Our constitution requires that they shall be authorized by express law or general law so that they can be under the control of the state.

Any joint stock company exercising any of the functions of a corporation, which joint stock company is not organized under any of the laws of Idaho, would be a nuisance. There-fore the Denver Townsite Company is a nuisance.

(See, also, authorities cited by same counsel in case of same title, 10 Idaho, 129, 77 Pac. 216.)

SULLIVAN, J.—This is an action to recover $2,350, and interest for commission as real estate brokers, for the sale of certain land situated in Idaho county. The sufficiency of the complaint was sustained by this court on a former appeal (10 Idaho, 129, 77 Pac. 216). After filing the *remittitur* in the court below, the administrator and administratrix of the Benjamin F. Morris estate answered, as did also the defendants, John P. Vollmer and Robert Schleicher. The other defendants were not served with summons and did not appear in the action.

It is alleged, among other things, in the complaint, that the appellants were copartners engaged in general real estate brokerage and commission business at the town of Moscow, Latah county, and were engaged, among other things, in procuring purchasers for lands belonging to third persons, and buying and selling real estate for others; that Benjamin F. Morris was a resident and inhabitant of Lewiston, Idaho, and that on the fourth day of June, 1902, he died intestate, leaving surviving him certain heirs, and that the said J. B. Morris and Harry F. Morris were duly appointed administrator and administratrix of the estate of said deceased; that during the lifetime of said Morris, in the year 1895, he and the defendants, Dernham, Kauffman, Vollmer, Schleicher and Scott, associated themselves together by an instrument in writ-

ing, dated September 18, 1895, in a syndicate to purchase of and from said Morris, now deceased, certain real estate, describing it, consisting of 2,720.80 acres of land, situated in Idaho county, for the purpose of reselling the same and dividing the profits thereof, in which syndicate each of said persons, except said Morris, deceased, acquired and was the owner of and entitled to a one-eighth part of said land and the profits thereof, and that said Morris, deceased, acquired in said association a three-eighths interest and was entitled to three-eighths of the profits thereof; that by said article of agreement the said Morris, now deceased, was required to, and did, deed in trust for said syndicate said lands to the said Robert Schleicher, and that by the terms of said articles to facilitate the accomplishment and purpose of said syndicate, the said Schleicher was appointed secretary of said association under the following agreement, which was signed by each of said defendants:

"This instrument, made this 18th day of September, 1895, witnesseth, that whereas, Benjamin F. Morris, was the owner of the following lands in Idaho county, Idaho, to-wit: (Here follows a description of said 2720 80-100 acres) . . . . and he agreed with the following persons, to-wit: Henry Dernham and William Kauffman, of Moscow, Idaho, John P. Vollmer and Robert Schleicher, of Lewiston, Idaho, and Wallace Scott of Mt. Idaho, Idaho, to join them in a syndicate to purchase said lands of him and resell the same and divide the profits thereof, in which syndicate each of said persons should take and pay for a one-eighth share and be the owner of and entitled to a like portion of the profits thereof, and said Benjamin F. Morris should take and pay for a three-eighth share, and be the owner of and entitled to a like portion of the profits thereof. . . . . And whereas, said Benjamin F. Morris has by deed of even date herewith conveyed to Robert Schleicher in trust for this syndicate according to these articles of agreement said 2720.80 acres, all except the 166 acres last above described, subject to a mortgage on which there is due of principal nine thousand dollars besides inter-

est, and to the payment by the syndicate, including Benjamin
F. Morris, of 4320.00-100 dollars of the purchase money,
with interest thereon from the 1st day of May, 1895, at the
rate of 10 per centum per annum until paid.

"Now, therefore, in order to facilitate the accomplishment
of the purposes of said syndicate, we, the said parties, here-
by organize ourselves into an association and agree as fol-
lows: 1. That the name of said association shall be the Denver
Townsite Company, and the principal office of said associa-
tion shall be at Lewiston, Idaho.  2. That the members of
the association and their executors, administrators, heirs and
assigns, shall, in proportion to their interests therein, pay the
obligations thereof, and share in the profits thereof.  3. That
the title to said lands is to be subject to all the terms and
provisions, powers and trusts of these articles of agreement .
and the amendments and alterations thereof which may be
made from time to time.  4. That this association shall not be
dissolved or any of the powers herein given or which may be
given, be revoked by any transfer at any time of the interest
of any member thereof, or any part thereof, whether by act
of the party or by operation of law, or by the death of any
member or members thereof, or their successor or successors
at any time.  5. That in order to maintain and continue this
association no member or members, or successor or successors
thereof shall for five years from date hereof have any right
of partition of said lands or any of them, but shall have such
right thereafter.  These articles of agreement shall be bind-
ing upon the parties, their assigns, whether by act of party
or operation of law, and their heirs, devisees, executors and
administrators.  6. The interests of the members of this as-
sociation in the property thereof shall be represented by eight
certificates which shall be and are hereby agreed to be per-
sonal property.  The members have only a right to the avails
or proceeds of said property, the title thereto both legal and
equitable remaining and being in said trustee, his successor
or successors in trust.  (Here follows a form of a share-
holder's certificate.) . . . . 8. The certificate of shares in and

interests of members of this association in its property can
only be transferred in the manner prescribed in the form of
certificate last above set forth and not then unless all obli-
gations of the assignor to the association are paid.   No trans-
fer shall be made for five days immediately before a meeting
of the shareholders or for five days immediately before the
time when a dividend is payable.   9. That the annual meet-
ing of the shareholders shall be held in Lewiston, Idaho, at
the office of First National Bank, of Lewiston, Idaho, on the
second Tuesday of May, each year, at 2 o'clock, P. M.   That
no meeting of shareholders shall be competent to transact
business unless a majority in interest of the shareholders shall
be represented, but less than a majority may adjourn from
day to day or until such time as may be deemed proper; that
at such annual meeting a president, vice president and sec-
retary for the ensuing year shall be elected by ballot, to serve
one year, until their successors are elected and qualified.   Spe-
cial meetings of the shareholders may be called by any three
shareholders by notice in writing, by mail or otherwise, to
meet at Lewiston, Idaho, at the office of the First National
Bank of Lewiston, Idaho, at an hour to be designated in the
notice, such notice to be mailed or served not less than five
days prior to date of meeting.   When all shareholders as-
semble and so agree, either in person or by proxy appointed
in writing, a special meeting may be held without any notice.
That at all meetings of the shareholders each shareholder
shall be entitled to cast one vote for each certificate held by
him.   He may vote in person or by proxy appointed in writ-
ing.   The president or presiding officer may vote his own
share or shares, but shall not have power in addition as pre-
siding officer to decide a tie vote.   The secretary shall keep
a record of each meeting.   10. That a majority in interest of
the shareholders of this association at any meeting thereof,
shall have as full and ample power and authority to do or
authorize to be done any and everything of every nature
whatsoever, as an individual owner of said lands in fee simple
would have, provided only that they cannot issue or author-

ize the issue of any negotiable instruments or borrow money, except to renew or extend or take up or pay off a mortgage or vendor's lien on said lands or some part thereof; that the only other manner in which they can raise money (except from income or sale of property) is by levy of assessments as hereinafter provided, upon the shareholders; that nothing except the consent of all the shareholders shall authorize the creation of any personal liability against the shareholders, and all contracts entered into shall be limited to creating a liability against the property of the association. 11. The officers of this association shall consist of a president, vice president and secretary, who shall be elected by the shareholders and shall perform the duties usually appertaining to their respective offices, except that the secretary shall perform also the duties usually appertaining to the office of treasurer. They shall hold office for one year and until their successors are elected and qualified. . . . . No person shall hold any of those offices unless he be a shareholder, and a transfer of his share as provided in these articles of agreement shall operate as a resignation by him. . . . . 12. The secretary of this association is hereby required, authorized and empowered to sell, contract for sale of and convey by such form of conveyance as he may deem best, all or any part of the lands or lots or blocks contained in the 2720.80 acres above described for such price or prices, and upon such terms, at public or private sale, as he may deem best, subject to the directions of the shareholders, and no purchaser need see to the application of the purchase money or to any such directions of the shareholders, or to the qualifications of the secretary as such officer. He shall have these articles of agreement and said deed to him recorded in Idaho county. The secretary shall also have power to sell all products which may be received from any of said lands when and for such prices and on such terms as he may deem best. He may, out of any money in his hands as secretary or treasurer, pay the taxes on said lands, insurance premiums on any property of the association, or any property on which it may have an incumbrance, and

interest on any incumbrance or incumbrances on said lands or any part thereof, also all necessary repairs at the wells or of fences or other property on said lands, and all expenses incident to construction of fences made necessary by any changes in roads. He may take any action he may deem most for the interest of the association in the matter of any actions or proceedings of the county commissioners concerning roads. The secretary shall incur no obligations which shall altogether exceed five hundred dollars without additional authority. He may deposit any money on hand in his name as treasurer of Denver Townsite Co. in any National Bank and check out the same. He may procure such record books and stationery and blanks, from time to time, as may be necessary. He shall keep an account and record of the affairs of the company and render accounts and reports at the annual meetings and record the same in the record book of such meetings and whenever requested by vote at any meeting render accounts and pay over any money due the Denver Townsite Company.''

It is also alleged that the said Dernham, about the year 1898, removed out of the state of Idaho, and since that time has been a nonresident; that about the month of May, 1902, said defendants, acting by and through their vice-president, Benjamin F. Morris, and acting by and through their secretary, Robert Schleicher, listed with the plaintiffs the said lands and premises for sale, and employed plaintiffs to procure a purchaser for said lands at a sum sufficient to pay the plaintiffs five per cent commission and net the defendants $17.50 per acre, reserving to defendants the crops thereon for the year 1902, and that plaintiffs accepted said employment and entered upon the discharge of their duties thereunder immediately, and attempted to and did procure a purchaser for said lands who was ready, willing and able to purchase the same and pay therefor, and introduced said purchaser to the defendants through their vice-president. That thereafter, while plaintiffs were still negotiating with said purchaser for the sale of said lands on the terms above stated, the defendants concluded and perfected a sale of said lands to

said purchaser so procured by plaintiffs, and sold the same to said purchaser for the sum of $47,000 on August 15, 1902, the same being a smaller sum than the sum for which the defendants had listed the said lands with the plaintiffs. It is further alleged that plaintiffs presented their said claim for the sum of $2,350, with interest thereon, to the said administrator and administratrix of the estate of said Morris, deceased; that said claim has not been allowed by them; that said defendants have failed and refused to pay plaintiffs five per cent commission on the said sum of $47,000, and by way of alleging the same cause of action in a different form and as a second count in said complaint, the plaintiffs reiterate, by way of reference, the first nine paragraphs of their first cause of action and allege their claim as upon a *quantum meruit,* alleging that the services so rendered for the defendants were reasonably worth five per cent on the amount for which said lands were sold. And by way of alleging the same cause of action in a different form and as a third count of the complaint, the plaintiffs reiterate the first nine paragraphs of the first cause of action, and allege that the transactions had between the defendants and said purchaser after the introduction of the purchaser to the said defendants by the plaintiffs are peculiarly within the knowledge of the said defendants, and that by the various actions of the said defendants in so making said sale to said purchaser at a sum less than had been listed by the defendants with plaintiffs for sale, the plaintiffs became and were prevented from concluding the sale with such purchaser upon the terms and for the price at which such lands had been listed with them, and that the defendants so prevented plaintiffs from completing said sale to deprive them of their commission thereon, and that by the various acts of the defendants as alleged, plaintiffs became and were damaged by a breach of the contract by defendants in the sum of said $2,350, with interest; judgment for that sum, with interest, was prayed for.

The answers are substantially the same and put in issue the material allegations of the complaint, and set up two

separate defenses. In the first defense, in the answer of appellant Vollmer, it is alleged that the only relation existing between the defendants was the relation arising out of, and constituted by said articles of agreement, under the name and style of the Denver Townsite Company, and denies that in the month of May, 1902, or at any other time or at all, the defendants, or any of them, either acting by or through their vice-president, Benjamin F. Morris, or by or through their secretary, Robert Schleicher, or by or through either of them, or by or through anyone at all, or by themselves or any of them, direct or otherwise, or at all, listed with the plaintiffs the lands and premises described in the complaint or any part thereof, for sale or for any purpose whatever, or employed said plaintiffs to procure a purchaser for said lands or any part thereof at any price whatever, or on any terms or conditions whatever, and denies that the plaintiffs did procure a purchaser for said lands or any part thereof; denies that they procured a purchaser who was ready or willing or able to purchase the same at any price. By said separate defense the issue is clearly made as to whether said real estate was listed with the plaintiffs for sale, and whether they procured a purchaser therefor, and the question whether said defendants Morris and Schleicher were empowered to represent the Denver Townsite Company or the members thereof other than as set forth in the said articles of agreement. It is also averred in said answer that said Denver Townsite Company never passed any resolutions or granted any authority to said Morris and Schleicher, or either of them, to list said lands with the plaintiffs for sale or to procure a purchaser therefor.

The second separate and affirmative defense of Vollmer alleges that the purchaser mentioned in the complaint was never ready or willing to purchase the land described in the complaint and pay therefor $17.50 per acre, reserving to the vendors the crops thereon, or to purchase or pay therefor any price or sum other than the sum of $46,240, for said land, $5,000 of which was cash, $11,240, with interest from August

15, 1902, at eight per cent per annum, payable on March 1, 1903, the balance thereof, to wit, $30,000, on or before three years from August 15, 1902, with interest at the rate of eight per cent per annum, payable annually, to be secured by mortgage on said land; that prior to the 15th of August, 1902, plaintiffs had had more than a reasonable time within which to negotiate with the said purchaser, and to cause or induce him to become ready and willing to pay for said lands the sum of $17.50 per acre, reserving to the vendors the crops thereon for the year 1902.

The case went to trial before a jury upon the issues thus made, and resulted in a verdict in favor of the plaintiffs. A motion for a new trial was denied and an appeal was taken both from the judgment and the order denying a new trial. That appeal was submitted to this court for decision at its October term, 1905, and a decision was rendered reversing the judgment of the lower court. A petition for a rehearing was granted upon one of the points raised in the case, to wit, whether under the constitution and laws of Idaho, a joint stock association such as the Denver Townsite Company, could be legally organized or created. Oral argument was heard upon that point and quite lengthy briefs filed. It is apparent from the allegations of the complaint that counsel for the respondents considered the Denver Townsite Company a joint stock association, as it is so designated in the title of the complaint; and it further appears that this suit was brought upon the theory that said association was acting under the said articles of agreement. It further appears from the allegations of the complaint and said articles of agreement, as quoted therein, that said association was formed for the purpose of purchasing said 2,720.80 acres, and no other land, and selling the same for a profit; that said association was not organized to engage in the real estate business generally and was organized solely for the purpose of purchasing and selling said single tract of land. It is nowhere intimated that the plaintiffs were misled into believing that said association was a general partnership, and that each member thereof

had the power to bind said partnership as may be done in merchandising or other general commercial partnerships. It would not be contended that the manager of said association had the authority under said articles to purchase other real estate or create an indebtedness, not provided for by said articles.

With those facts before us, the question is presented as to whether said association was, under our constitution and statutes, a general partnership, each member thereof having the authority and power to sell said land and otherwise bind said association as a partner may do in a general merchandising or commercial partnership. Counsel for respondents contend that said association is a general partnership, and cites in support of that contention sections 2 and 16 of article 11 of the constitution of Idaho, which are as follows: Sec. 2. "No charter of incorporation shall be granted, extended, changed or amended by special law, except for such municipal, charitable, educational, penal or reformatory corporations as are or may be, under the control of the state; but the legislature shall provide by general law for the organization of corporations hereafter to be created; provided, that any such general law shall be subject to future repeal or alteration by the legislature." Sec. 16. "The term 'corporation,' as used in this article, shall be held and construed to include all associations and joint stock companies having or exercising any of the powers or privileges of corporations not possessed by individuals or partnerships."

It is contended by counsel for respondents that said sections of our constitution are peculiar to Idaho, but that is not true, as we find similar provisions in the constitutions of many of the states. The definition of a "corporation" given in section 16 is given in substantially the same language in the following cited state constitutions: N. Y. Const., art. 8, sec. 3; Cal. Const., art. 12, sec. 4; Kan. Const., art. 12, sec. 6; Ky. Const., sec. 208; Mich. Const., art. 15, sec. 11; Minn. Const., art. 10, sec. 1; Miss. Const., art. 7, sec. 16; Mo. Const., art. 12, sec. 11; Mont. Const., art. 15, sec. 18; N. Dak. Const.,

art. 7, sec. 114; Pa. Const., art. 16, sec. 13; S. Dak. Const., art. 17, sec. 19; Wash. Const., art. 12, sec. 5; Ala. Const., art. 12, par. 241; N. C. Const., art. 8, sec. 3; S. C. Const., art. 9, sec. 1; La. Const., art. 268; and Va. Const., art. 12, sec. 1.

From a reading of said section 16, article 11 of the constitution of Idaho, it will be observed that the word "corporation" does not include, as therein defined, all joint stock companies and associations, but only such as "have or exercise any of the powers or privileges of corporations not possessed by individuals or partnerships." The provisions of that section expressly affirm that there are joint stock companies or associations that do not have or exercise any such powers or privileges, and to which the term "corporation" as used in section 16 does not apply. In said section 16 the term "corporation" is there defined only with reference to its use in said section. The definition of the term "corporation" as given in said section would not apply to the Denver Townsite Company unless it possessed or exercised some of the powers or privileges not possessed by an individual or partnerships. The constitutional definition of the term "corporation" has been held by some courts as not being a general definition, but only a definition of that term as it is used in that article of the constitution.

The supreme court of the United States, in the case of *Great Southern Fire Proof Hotel Co. v. Jones,* 177 U. S. 449, 44 L. ed. 842, 20 Sup. Ct. Rep. 693, referring to the definition of the term "corporation" as used in section 13, article 16 of the Pennsylvania state constitution, said: "The only effect of that clause is to place the joint stock companies or associations referred to under the restrictions imposed by that article upon corporations, but not to invest them with all the attributes of corporations."

In *People v. Coleman,* 5 N. Y. Supp. 394, affirmed in 133 N. Y. 279, 31 N. E. 96, 16 L. R. A. 183, it was held that this provision in the constitution of New York only applied to the term "corporation" as used in the article referred to in that constitution, requiring that there should be entered after the

word ''corporation'' at every place in that article the fol-
lowing: ''All associations and joint stock companies having
or exercising any of the powers or privileges of corporations
not possessed by individuals or partnerships.'' That being
the effect of this definition of the term ''corporation,'' we will
apply the various provisions of article 11 of the Idaho con-
stitution to the Denver Townsite Company, and find wherein,
if at all, the question before the court is affected thereby.
The only provision of the article which counsel contends has
no effect upon the organization under discussion is section 2,
article 11, providing that ''No charter of incorporation shall
be granted . . . . by special law, . . . . but the legislature
shall provide by general law for the organization of corpora-
tions hereafter to be created.'' Taking into consideration the
term ''corporation'' as defined in said article, the language of
this section would be: ''No charter of incorporation, of any
corporation, association or joint stock company having or ex-
ercising any of the powers or privileges of corporations not
possessed by individuals or partnerships shall be granted
. . . . by special law, . . . . but the legislature shall provide
by general law for the organization of corporations and of
associations and joint stock companies having or exercising
any of the powers or privileges of corporations not possessed
by individuals or partnerships hereafter to be created.'' The
association under consideration is not affected by the lan-
guage of section 2, article 11 for two reasons: (1) The asso-
ciation under consideration is not a corporation exercising
any of the powers or privileges of corporations not possessed
by individuals or partnerships. It is a voluntary association.
To possess or exercise powers or privileges of corporations re-
quires a sovereign grant—a franchise which said association
has not and does not profess to possess. There are, however,
associations and joint stock companies that have and exercise,
under grant of the sovereign, powers and privileges of cor-
porations not possessed by individuals or partnerships to
which the language of the constitution is applicable. (2)
Even if the association in question were an organization hav-

ing and exercising under grant of sovereign authority, powers and privileges of corporations not possessed by individuals or partnerships, there is nothing in section 2, article 11 of the constitution that is applicable to it, since it is not operating or claiming to operate under any special law as inhibited in the first clause of that provision, and it is not violating such clause since the command of that clause is directed exclusively to the legislature to provide a general law for its organization. Such a general direction is not operative without legislative action. Cooley's Constitutional Limitations, seventh edition, 118, says: "Sometimes the constitution in terms requires the legislature to enact laws on a particular subject, and here it is obvious that the requirement has only a moral force; the legislature ought to obey it, but the right intended to be given is only assured when the legislation is voluntarily enacted."

Referring to this subject (of provisions of our constitution requiring legislative action) in *Jack v. City of Grangeville,* 9 Idaho, 291, 74 Pac. 969, this court said: "Under the provisions of said section it is the duty of the legislature to provide by law the method or means by which rates or compensation for the use of water supplied to any city or town (may be fixed)—which it is conceded the legislature has failed to do—unless it has been done by the provisions of section 2711. . . . . . Therefore, until the legislature provides a method for fixing rates, the contract between the parties will govern." The legislature has provided by general law only for the organization of corporations, and has not enacted a general law as commanded by the constitution for the organization of associations or companies exercising some of the powers or privileges of corporations not possessed by individuals or partnerships.

It is held in New York, in *People v. Coleman,* 5 N. Y. Supp. 394, under a constitutional provision like our own, that individuals may voluntarily organize and incorporate partnership associations without being affected by the constitutional definition of a corporation; that said definition only refers to

those associations and companies which, under grant of statutory authority, are exercising some of the powers and privileges of corporations not possessed by individuals or partnerships; that such an association or company cannot be formed without the consent of both the sovereign and individuals forming it; that the sovereign of New York having granted such statutory authority for forming such associations, before such an association can come into existence it is necessary for some individuals to accept said grant by filing articles and otherwise complying with the statutory grant; that until the grant has been accepted, no such association or company as is referred to in the constitution has come into existence, and that the constitution does not interfere with the right of individuals in New York to voluntarily associate themselves together as an unincorporated partnership association not having or exercising any of the powers or privileges of corporations not possessed by individuals or partnerships, and that if they so associate and organize without complying with and accepting any grant of sovereignty they are an unincorporated association only, not having or exercising any of the powers or privileges of corporations not possessed by individuals or partnerships, and are outside of the provisions of the constitutional definition of a corporation.

The correctness of the foregoing analysis as given by the decision last cited clearly appears from the growth of the law upon this subject. It is stated in Cook on Corporations, volume 2, fifth edition, section 1076, as follows: ''The earlier cases declaring that joint stock companies were illegal were so decided largely because of the Bubble Act, which was in force from 1720 to 1826. Very high. English authority, after a thorough review of the English cases, gives the opinion that at common law joint stock associations are legal,'' citing Lindley on Company Law, fifth edition, 130, and commenting in note 3 on Lindley's discussion of the subject, as follows: ''In a thorough and exhaustive note on this subject the learned author refers to *Rex v. Dodd* (1808), 9 East, 516, holding that a company with a prospectus limiting the lia-

bility of subscribers is illegal, as a trap to ensnare the unwary; *Josephs v. Pebrer* (1825), 3 Barn. & C. 639, holding that unincorporated companies with transferable shares are illegal; and *Buck v. Buck* (1808), 1 Camp. 547, and *Rex v. Stratton* (1809), 1 Camp. 549, note to same effect.

The author then cites a number of cases, and says those cases contain *dicta* only so far as they passed on the legality of these companies. Then the author cites a large number of later cases, and says that they finally establish the legality of joint stock associations, and the learned jurist comes to this conclusion and says: "The case of *Blundell v. Winsor,* always relied upon as an authority by those who contend that such a company is illegal, has never met with approbation from the bench, nor has it ever been followed. Upon the whole, therefore, it appears that there is no case deciding that a joint stock company with transferable shares, and not incorporated by charter or act of parliament, is illegal at common law; that opinions have nevertheless differed upon this question; that the tendency of the courts was formerly to declare such companies illegal; that this tendency exists no longer; and that an unincorporated company with transferable shares will not be held illegal at common law unless it can be shown to be of a dangerous and mischievous character, tending to the grievance of her majesty's subjects. The legality at common law of such companies may therefore be considered as finally established."

I think it is clearly established by the decided weight of authorities that such a joint stock association as the one under consideration is clearly legal under the common law, and is not prohibited by the constitution or statutes of this state.

Theodore W. Dwight, supreme court commissioner of New York, in an article in the Political Science Quarterly, volume 3, page 610, 1888, in summing up the conclusions of an elaborate article on unincorporated associations, stated: "It is not a nuisance at common law for persons, no matter how many, to agree to form an unincorporated association and to issue certificates of shares representing property contributed,

nor to make the certificates transferable either by written assignment or by delivery, nor to establish a committee having power to make rules for the government of the association. Persons doing these acts do not usurp the functions of a corporation, for the great and distinguishing feature of a corporation is the possession of such juristic qualities as to be a new, legal person, distinct from the individuals forming it. To usurp the functions of a corporation, there must be the usurpation of the qualities of a 'person,' as, for example, to sue or to be sued in an assumed corporate name.''

In *Phillips v. Blatchford,* 137 Mass. 510, the court said: ''It is too late to contend that partnerships with transferable shares are illegal, . . . . the grounds upon which they were fairly said to be illegal in England, apart from statute, have been abandoned in modern times.''

As the constitution of Idaho and the statutes of the state do not prohibit the organization of joint stock associations having transferable stock, such as the one under consideration, the common-law rule as to their legality prevails in this state. Such conditions have existed in mining districts from the earliest periods in England and in the United States. (2 Lindley on Mines, 2d ed., sec. 1430 et seq.)

The author refers to the distinctive features of such partnerships viz.: the absence of the *delectus personae,* which characterizes ordinary partnerships; that neither death nor bankruptcy of one of the members dissolves it; that the sale of a mining interest by a partner does not dissolve the partnership, and says: ''The origin of this species of limited partnerships may be traceable to the early periods of mining in the west, and while it has been the subject of legislation in some of the states in recent years, *such legislation is but little more than declaratory of the rules announced by the courts as governing the relations upon what may be termed the American common law of mining partnerships.*'' (See 2 Snyder on Mines, pp. 11, 39, 40.)

In the constitution of California (1849), article 4, section 33, the term ''corporation'' is defined substantially the same

as in section 16 of our own constitution, and in a number of cases in California the supreme court of that state has not considered that their constitutional provisions interfered with the organization of such unincorporated associations, as appears in its decisions from *Von Schmidt v. Huntington*, 1 Cal. 57, down to *Lowenberg v. Greenbaum*, 99 Cal. 162, 37 Am. St. Rep. 42, 33 Pac. 794, 21 L. R. A. 399.

The history of the use of this form of association is given to some extent in *Warner v. Beers*, 23 Wend. 103. Such an association as the one under consideration, not organized for engaging in the real estate business, but for the purpose of acquiring and holding title to a particular piece of real estate, is not a general business partnership. It is not a violation of the constitution or statutes for a number of people to get together to acquire a particular piece of property and place the title to the same in a trustee, whose powers and authority are definitely limited and defined and subject to instructions from the shareholders, either directly or indirectly through a board elected by the shareholders at regularly constituted meetings of the shareholders. This constitutes simply a definition of the trusts and powers subject to which a particular piece of real estate is held. The articles of association create a power of attorney to the trustee, subject to the limitations upon the powers in respect to action required either of the shareholders or directors. It is a wholesome method of co-operation which assists in bringing together and organizing small funds into a large investment.

We will next consider the distinctive features between a corporation and a partnership. In this state there is no statute granting unincorporated associations any of the powers or privileges of corporations and without such grant such associations cannot either possess or exercise any corporate franchises.

Thompson on Corporations, volume 7, section 8140, states: "The creation of a corporation is not within the power of the individuals who subscribe to its stock. It is exclusively the work of the law; . . . . nor is it altogether accurate to say

that the creation of a corporation is exclusively the work of the law; . . . . the creation of private corporations is never exclusively the work of the law, but is always the concurring work of the law and private adventurers . . . . by an organization, under a general enabling act already in existence.''

The supreme court of New York in *People v. Coleman,* 133 N. Y. 279, 31 N. E. 96, 16 L. R. A. 183, in referring to the difference between corporations and such associations, said: ''The one derives its existence from the contract of individuals, the other from the sovereignty of the state.'' In New York they have a statute authorizing the organization of joint stock associations, but it is held that such associations as do not possess or exercise powers and privileges not possessed by individuals or partnerships need not be organized under the provisions of said statute. In other words, the common-law right of individuals to make contracts not illegal or prohibited by law still remains, and has not been taken away by said provisions of the constitution.

In *Hoadley v. County Commissioners,* 105 Mass. 519, the court said: ''This is a voluntary association of individuals, and its articles of agreement, although they adopt some of the forms of managing the business usual in corporations, constitute a copartnership. . . . . It has none of the special attributes which belong to a corporation duly organized under our laws. . . . . The provision that each member may sell and transfer his interest and thus introduce a new partner, though unusual, is not inconsistent with the contract of copartnership.''

In *Warner v. Beers,* 23 Wend., at page 148, the court defines the different peculiar functions of these unincorporated associations, and designates the powers or privileges of corporations not possessed by individuals or partnerships.

The court there held that transferability of shares is not one of the powers or privileges of a corporation not possessed by individuals or partnerships; that one of the natural incidents of a corporation is to sue or be sued in its corporate

name without the necessity of naming all or any of the individuals composing the aggregate body. Under the laws of this state the association under consideration has not the absolute right to be sued in its associate name; while in the complaint the Denver Townsite Company is named in the title, each and every of the members composing that association are also named therein and the suit is against them in person. Such an association may use a common seal and it may make by-laws by which it shall be governed. Those matters are not powers or privileges of corporations not possessed by individuals or partnerships. The court then holds that it is the settled law of England that it may be stipulated that death shall not dissolve the partnership. Under our law the partners may agree that death shall not dissolve the partnership, and such an agreement is legal and valid. In the case at bar the association has a descriptive name, but it is not used either for the purpose of suit or conveyancing. The title to said land was taken in the name of the trustee, and this suit is brought directly against the stockholders, naming them, and not against the association in its associate name. Its articles of association do not state that it is a joint stock company, but respondents have so alleged in their complaint. Its articles simply call it an association. In the Warner-Beers case, *supra,* the court discusses the matter of an exemption from personal liability of the shareholders. The doctrine laid down in .that case is in harmony with the doctrine settled by the United States supreme court in the case of *Great Southern Fireproof Hotel Co. v. Jones, supra,* holding that unincorporated associations, even though organized under the statutes giving them powers to use a *company name,* in which to sue and be sued, with limited liability and corporate seals, are not corporations but partnerships within the federal statutes prescribing the jurisdiction of courts of the United States.

The only feature of the association under discussion that is material at this time; to determine whether it has powers or the privileges of a corporation not possessed by partnerships,

is the feature of limitation of agency of the members of the association. This, we have seen, was an incident of associations under the common law resulting from the lack of the right of *delectus personae,* and not an incident of a corporation not possessed by a partnership, and may be enforced.

A corporation cannot be formed by private agreement between individuals. The franchise is possessed by the state, and even the state cannot compel people to accept its bounty. Joint stock companies may be formed without regard to the statutes, and the promoters may choose to proceed solely upon their common-law rights and responsibilities. That doctrine is laid down in *People ex rel. Winchester v. Coleman,* and it is there said: "There is in fact no statute of the state providing for the formation of joint stock companies or limiting their organization. Such companies may be said to be recognized by the acts which have been referred to conferring privileges upon them. In that sense of recognition they are authorized and sanctioned by these acts. It is, however, the common-law right of a private association which is thus organized; and as no limitation is imposed upon that right or form prescribed for its legal exercise, it is treated as coextensive with the general right to contract lawfully. . . . . But the individuals so contracting may, if they see fit, ignore the statute and proceed strictly under the contract and its common-law conditions. . . . . The true test is whether the being. is natural or artificial. It is artificial if created by statute or called into being by compliance with statutory provisions. It is natural when solely the creature of private contract."

Morawetz on Private Corporations, volume 1, second edition, section 6, speaking of joint stock companies, says: "Their situation varies greatly, and they may be found of every possible variety from an ordinary copartnership to a corporation in the strictest sense of the word. Their real organization and character must, in each case, be determined by reference to the laws and articles of agreement under which they are formed." Such associations are styled "joint stock companies" (see 17 Am. & Eng. Ency. of Law, 2d ed.,

636; 4 Ency. of Law & Pr. 309; 29 Century Digest, 1511 and 1512), and are sometimes styled partnerships, and they are partnerships in some respects, but from partnerships they differ in some particulars. In an ordinary partnership, unless there is an agreement to the contrary, the death or withdrawal of a member works a dissolution of the firm. In joint stock companies, however, the death of a member or the withdrawal or transfer of its interest does not involve a dissolution of the company, in which company there is no *delectus personae*. (17 Am. & Eng. Ency. of Law, 2d ed., 637, 638.) While a joint stock company is a partnership, it is different and attended with different incidents and liabilities from a partnership formed between a few individuals to carry on a business jointly and with equal powers and without transferable shares. All who have dealings with a joint stock company know that the authority to manage the business is conferred· upon the directors, and that a shareholder, as such, has no power to contract for the company, and for this purpose it is wholly immaterial whether the company is incorporated or unincorporate. In 4 Cyclopedia, 310, it is stated: "In the absence of authority specially conferred, a single member has no power to bind the association." And at page 308, it is said: "The powers and authority of the officers of an association are generally regulated by the constitution and by-laws; . . . . where the officers act under special or limited powers, their action must be in strict conformity therewith, or the association will not be bound thereby." (See *Sullivan v. Campbell*, 2 Hall (N. Y.), 295.) In *McConnell v. Denver*, 35 Cal. 365, 95 Am. Dec. 107, it is held that an "unincorporated ditch company . . . . differs from ordinary commercial partnership, and that a manager of such company has no power or authority to bind the company with his contracts unless duly authorized." In *Willis v. Greiner* (Tex. Civ. App.), 26 S. W. 858, it was held that where an unincorporated joint stock company, dealing in lands, vests the title in three directors and empowers them to make conveyances "subject to directions of the stockhold-

ers,'' the president or secretary have no power to contract with real estate agents for the sale of land, and the association is not bound thereby, unless it has authorized the contract or ratified the same. In that opinion it is said: ''Joint stock companies are generally held to be no more than ordinary partnerships, but there are distinctions which must be observed. In ordinary partnerships any member may bind the firm by his acts in the course of his business, but in a joint stock company the management of the affairs of the company may be intrusted to the officers or trustees. (11 Am. & Eng. Ency. of Law, p. 1038, note 1.) . . . . The association, however, had the power to make the contract sued on and to confer the authority upon its president and secretary, but it is not shown that it ever did so.'' On rehearing the court said: ''It was such as the president and secretary had no authority to make. There is no evidence to show that the contract was ratified by the directors.'' In *Appeal of the Merchants' Fund Assn.*, 136 Pa. St. 43, 20 Am. St. Rep. 894, 20 Atl. 527, 9 L. R. A. 421, Mr. Justice Williams, in setting forth some of the characteristics of such an association, said: ''First, what is the legal status of the company? Second, what is the relation of the stockholders to the company? . . . . The relation of the stockholders to the company is also settled largely by the articles of agreement; they contribute the capital, select the trustees who are to use and invest it, and are entitled to a distributive share of the profits made in the business. . . . . They have, however, no power to use the money of the company, to interfere with its business, or to bind it in any manner. This power they have voluntarily surrendered and committed to the trustees selected by them as the agents and representatives of the company; so that the firm or company speaks not through its members as such, but through its trustees. . . . . The interest of each member was therefore an interest in the profits made. He had no title to the land bought by the trustees of the company as a tenant in common or otherwise, and could neither convey nor encumber it, . . . . the company was not dissolved by Oliver's

death, and has not yet been dissolved. . . . . The relation between it and the holders of its stock is, therefore, the same since Oliver's death as before.'' It is stated in 17 American and English Encyclopedia of Law, second edition, 638, as follows: ''All who have dealings with a joint stock company know that the authority to manage the business is conferred upon the directors, and that the shareholders, as such, have no power to contract for the company.'' In ordinary partnerships, every partner's power to contract is coextensive for the purpose of the company, but in joint stock companies where the interest of the members is represented by transferable shares, it is well settled that a shareholder is not necessarily an agent of the company, and that their official position in the company indicates such powers only as are defined and granted in the articles of association, or as may be given by resolution of the shareholders or directors.

Counsel for respondent have cited a large number of authorities upon the question of what constitutes a partnership. We do not take issue with counsel as to the doctrine of those authorities. There are varied degrees of authority of partners to bind the partnership in the various kinds of partnerships. In a commercial or trading partnership, such as engages in trading in merchandise or in financial operations, every partner has power to execute such negotiable paper as is used in such partnership. In a nontrading partnership, however, such as a law firm or real estate or mining partnership, the members have not generally the power to execute negotiable paper. In joint stock companies the shareholders have no powers as agents, unless such powers are granted either expressly or by implication, or by acquiescence of such shareholders or association. In my view of this matter, said section 12 of the articles of association stands in no higher light as far as the extent of the power is concerned than a power of attorney defining the powers of the secretary. It is in fact a grant of power defining the authority of the secretary in making sales of said real estate. It seems to be a well-settled rule that the provisions of the articles granting

such powers should be strictly construed. (1 Am. & Eng.. Ency. of Law, 2d ed., 999.) In cases of this kind grants of power are not all the same, and when it comes to a construction of them, each must be construed according to the language of the particular power granted, and wherever the power granted is sufficiently broad to authorize the trustee or agent to appoint subagents, of course they may do so. In this case that power is reserved to the shareholders in meeting assembled, except in so far as they have in the articles of association granted specific authority to the secretary. By the provisions of said section 12, they granted authority to the secretary, subject, however, to their direction to make sales, but there is no implication that he should have authority to delegate the power to make sales. It is provided in said section 12 that purchasers are relieved from inquiry concerning the application of the purchase money, or to any directions of the shareholders, or as to the qualifications of the secretary. This is equivalent to a declaration that all other persons must inquire as to his authority.

In volume 1 (second edition) of Warvelle on Vendors, section 63, the author, in discussing syndicates and joint stock companies, among other things, says: "As a general proposition, such associations may be classed as partnerships, and to them any of the general principles of partnership are fully applicable. The articles of association will, of course, go far to determine the character which the members sustain both toward each other and to the public, but where, as is generally the case, the capital is contributed on the basis of a specific sum for each share in the enterprise, the lands purchased being held and managed for the joint account by the trustee, and the interest of the members or the shareholders is limited to a participation in whatever profits may be realized on the company's ventures, the shares are simply personal property. As a rule, the holders of such shares have no estate in or title to the land purchased by the trustee, as tenants in common or otherwise, and they can neither convey nor encumber it." The Denver Townsite Company is such

an association as the author there refers to, and the death of one of the shareholders (the vice-president, Benjamin F. Morris) did not terminate the partnership or association. It is clearly recognized by the highest courts of many of the states and law text-writers that while some of the principles of partnership may apply to such associations, they cannot, from the very nature of the organization of such associations, be entirely controlled by the legal rules and principles that control ordinary partnerships. I conclude, therefore, under the law and said articles of association, a shareholder or officer of said association has no power or authority in regard to the sale of the land belonging thereto except that granted by the articles of association or by resolution of the shareholders. By the provisions of said section 12 of the articles of association, the secretary was prohibited from incurring any indebtedness which should exceed $500. If he did in fact list said property with the respondents, and they procured a purchaser, he incurred an indebtedness of more than $2,000. I therefore conclude that the Denver Townsite Company was a partnership governed and controlled, so far as the powers and rights of the shareholders are concerned, by its articles of association, and that the said Morris, as vice-president, or the said Schleicher, as secretary, had not the authority or power under said articles to list the association's lands for sale with the respondents.

The next question that we shall consider is whether the Denver Townsite Company listed said land with the respondents for sale. It is alleged in the complaint that about the month of May, 1902, the defendants, acting by and through their vice-president, Benjamin F. Morris, in the absence of their president, Henry Dernham, and acting by and through their secretary, Robert Schleicher, listed with the plaintiffs said lands and premises for sale, and employed plaintiffs to procure a purchaser therefor at a sum sufficient to pay plaintiffs five per cent commission, and net the defendants $17.50 per acre, reserving the crops thereon, and that the plaintiffs accepted said employment and entered upon the discharge of

their duties.  It does not clearly appear from the evidence just what B. F. Morris did in attempting to list said land with the respondents.  It appears that there had been some correspondence between the respondents and said Morris, but the same is not contained in the record.  However, it appears that respondents wrote a letter to said Morris dated May 21, 1902, and that the appellant, Schleicher, answered that letter, which is as follows:

"Lewiston, Idaho, May 25, 1902.

"Messrs. Spotswood & Veatch, Moscow.

"Gentlemen: In reply to yours of the 21st inst. to B. F. Morris, would state that we have some 2100 acres of the land around Denver in cultivation, about equally divided between wheat and barley.  A purchaser could not get possession before next fall, after harvest is removed, nor would we expect to give him any part of the crop of this year.  The terms would be $17.50 per acre, net to us, including the part of which town lots have been, as a full 160 acres, or not taking that 160 at all, as purchaser might prefer.  I am aware that Mr. M. let you understand that your 5 per cent commission would come out of the $17.50, which I also was willing to do, but Messrs. V. & S. are not anxious to let go at all, and state that unless they can get $17.50 clear of commission, they will not consent to a sale.  Terms of payment could be arranged to some extent to suit purchaser's convenience, but should require one-half of price down.

"Yours truly,

"R. SCHLEICHER."

It appears from that letter that Morris had let respondents understand that they should have five per cent commission, provided they procured a purchaser at $17.50 per acre, and that the secretary was agreeable thereto.  But two of the respondents would not consent to that arrangement and insisted on $17.50 per acre net.  Respondents did not reply to Schleicher's letter of May 25, 1902, and did not signify in any way their acceptance of the proposition stated in that letter, unless it be the letter of introduction of Mulhall to

Morris dated May 31, 1902, hereinafter quoted. Conceding that said acts of Morris and Schleicher amounted to a listing of said land for sale with respondents, the question arises whether they had the authority to list it. The minutes of the appellant association are contained in the record, and no resolution is found therein which authorizes Morris or Schleicher to so list said land. Then, did the appellant association ratify such listing? We find no evidence whatever in the transcript even tending to show that they did so.

Counsel for respondents has taken two positions in this case: First, that said association is a general partnership; second, that it is a corporation exercising and possessing powers and privileges not possessed by partnership. It is clear to us, under our law, that it is a partnership, but not a general partnership wherein each of the partners has plenary power to sell and otherwise dispose of the property of the association or purchase other land, or create indebtedness beyond that provided for in the articles. Under the constitution and laws of this state there is nothing prohibiting individuals from entering into such a contract as said association entered into. While the legislature, no doubt, has the power to prohibit such an agreement, it has not done so, and as heretofore shown under the common law, individuals may legally enter into such a contract; therefore such contracts are legal. I therefore hold that said contract of association was a valid and binding contract. It is nowhere alleged or shown that the plaintiffs were misled in any way in said matter. They knew of the agreement between the appellants, and that under the terms of said agreement the individual members of said association had no power or authority to list said land with them for sale. The complaint does not allege that respondents were misled or deceived into believing that said association was a general partnership, and that the shareholders had the powers of agency possessed by partners in a general partnership. This disposes of the case. But it is contended by counsel that respondents procured a purchaser, and I shall consider that question.

After Schleicher had written said letter of May 25th, nothing further was written, said or done in regard to the matter, so far as the record shows, until May 31, 1902, when in the morning of that day William Mulhall, of Sioux City, Iowa, went to the office of respondents in the city of Moscow, Idaho, and they gave him the following letter:

"Moscow, Idaho, May 31, 1902.

"Hon. B. F. Morris, Lewiston, Idaho.

"Dear Sir: This will introduce Mr. Wm. Mulhall, of Sioux City, Iowa, who is on his way to Denver for the purpose of examining the company's property with a view of purchasing and locating a colony. We have also given him a description of two other pieces of land, your No. 35 and No. 36. You know these lands better than we do, so you will please go into details with him, and tell him all about the Camas Prairie country. If he is pleased with the country and price is satisfactory, he will want to buy considerable more land than that owned by the company. Show him everything you have. Any attention shown Mr. Mulhall will be appreciated by

"Yours truly,

"SPOTSWOOD & VEATCH."

It will be necessary to go back a little and show the facts and circumstances that caused Mulhall to come to Idaho and call on respondents at the time they gave him said letter. Mulhall was engaged in the real estate business at Sioux City, Iowa, and in April, 1902, he received a letter from said B. F. Morris that contained a printed list of forty-four different tracts of land that said Morris was advertising for sale, which tracts were numbered from 1 to 44, inclusive. In said printed list sent to Mulhall the tracts numbered 34, 35, 36 and 37 were inclosed with ink pen marks. Number 34, was the 2,720.80 acres referred to in this suit, and No. 37 was 2,700 acres of land near Pomeroy, state of Washington. That advertisement No. 34 is as follows: "No. 34—2720 80-100 acres in compact body, fine black loam, bunch grass land, in

center of Camas Prairie; town of 75 inhabitants, church, stores, roller mill, postoffice and shops; fine four room schoolhouse near center of the tract; .... it is ten miles from Grangeville and ten miles from Cottonwood on main stage road, 16 miles from terminus of railroad. .... Price $20.00 per acre.'' The letter from Morris and said list first called Mulhall's attention to said land.

William Mulhall testified as follows: ''No, sir; I had no communication from Messrs. Spotswood & Veatch, either oral or written, at any time, calling my attention to this 2,720 acres of Denver Townsite property before I received that communication from B. F. Morris. I had not even seen any advertisement of this Denver Townsite property of any kind prior to the time I received this real estate circular from Benjamin F. Morris, deceased. The two thousand seven hundred and twenty and a fraction acres of land described in this B. F. Morris real estate circular, answers the description of the Denver Townsite property which I bought. .... I left Sioux City, Iowa, and came west to look at this property on or about the first Tuesday in May, 1902. The main object of my trip west at that time was to see this land; the Denver land. I met Messrs. Spotswood & Veatch about the last of May, 1902, when I was coming to this part of the country to see these Camas Prairie lands, and on my road here I came by the way of Colfax and Moscow, and then here. After arriving at Colfax I found I had to wait there for several hours; that same evening I arrived at Moscow, stayed there all night, and on the following day I had to wait until noon or a little after to get a train here. While in Moscow I happened into their office, made some inquiry about the Denver land and the country in general, and that is the first time that they have said a thing about those lands, and he suggested giving me a letter of introduction to Mr. Morris, and so I took the letter. That is the letter that has been referred to here as the letter of introduction of myself from Spotswood & Veatch to Mr. Morris.'' Q. ''And your main object in coming west was to see the lands here in Idaho, was it?'' A. ''Yes,

sir.''    Q.    ''Why didn't you go to see the 2,700 acres over close to Pomeroy?''    A.    ''I could answer that by going into a little detail. . . . . When I arrived at Pendleton I visited a friend there, a farmer who had been in Camas Prairie shortly before that, and he encouraged me to go on to that country and said it was the best country.    The description of the soil is what gave me the preference.''

The 2,700 acres of land close to Pomeroy above referred to was a tract of land advertised for sale as number 37 of the circular sent to Mulhall by B. F. Morris.    It seems that the said Morris had that tract of land listed with him for sale.    Mulhall further testified that he had an uncle living near Moscow, whom he had lost track of, and when he arrived there he endeavored to locate him, and his landlord at the hotel referred him to a gentleman sitting in the office by the name of McGowan.    McGowan could give him no information in regard to his uncle, but informed Mulhall that the respondents, the firm of Spotswood & Veatch, were well acquainted there, and they probably could give him some information about his uncle.    During that conversation he informed McGowan where he was from and where he was going, and talked to him in regard to the Camas Prairie country.    McGowan informed witness that he would go with him the following morning to the office of respondents, and on the following forenoon, while witness was visiting with a party of acquaintances from Iowa who had just returned from a trip to the Camas Prairie country, McGowan came up and asked witness to go to the office of Spotswood & Veatch with him.    He thereupon went and was introduced to Spotswood and Veatch, and they introduced witness to some old gentleman there, who was an old-timer, with whom he talked about the country and about his uncle, and it appears that he also talked with Spotswood and Veatch in regard to the Camas Prairie country.    Witness informed them of his mission there and they stated to him that Mr. B. F. Morris was an old acquaintance of theirs, an old associate, and a very reliable man to deal with, and spoke very highly of him, and stated to Mulhall that they would give him a letter of intro-

duction to Morris, and thereupon they prepared the letter, which is the letter above set forth, dated May 31, 1902. Mulhall on that day proceeded to Lewiston and there met Mr. Morris and handed him the said letter of introduction. On cross-examination, the witness testified as follows: Q. "Then why did you get a letter of introduction from Spotswood to Morris when you claim you didn't know Spotswood?" A. "Why, he volunteered the letter." Q. "What was the conversation that led up to his giving you the letter of introduction?" A. "Inquiries which I made about the country. . . . . You understand I was coming out here to see the country and wanted to learn all I could. I might have asked a hundred questions or more; I couldn't recollect them at this time." Q. "You won't deny that he didn't draw your attention to those lands?" A. "I think I drew his attention to the lands." Q. "Then Mr. Mulhall, if you were coming to. Lewiston to see Mr. Morris, what did you ever deliver that letter to him for?" A. "Why, I delivered it as a matter of courtesy to Spotswood & Veatch. I would not intentionally promise a man to do a thing and not do it."

After Mulhall delivered said letter of introduction to Morris, he had an interview with him at which appellant Schleicher was present, and it appears at that interview Morris offered the said lands to Mulhall for $17.50 per acre, reserving that year's crops. That interview with Morris occurred on the evening of the 31st of May, or first day of June, 1902, and Mulhall proceeded to Camas Prairie to examine said tract of land. It is also shown that B. F. Morris was taken suddenly sick and died on the 4th of June, 1902. After examining the land, Mulhall returned to Lewiston and had further negotiations with the respondent Schleicher, who was the secretary of the said association, and made him an offer of about $40,000 for the land, which was declined. Thereafter Mulhall left Lewiston on his way home by the way of Portland, and when he arrived at The Dalles he called said Schleicher up by 'phone and inquired of him what their decision was in regard to his offer for the land. Schleicher replied that they declined it. Nothing further was done in

regard to the matter until July 8th, when Mulhall wrote the following letter to the respondents:

"Sioux City, Iowa, July 8, 1902.

"Spotswood & Veatch, Moscow, Idaho.

"Dear Sir: In compliance with your request when at your office, I desire to say that I did not make a deal with Mr. Morris for the land at Denver. In fact, I had arranged with him to go and see the land, but he was suddenly taken sick, and died in a day or two. However, I saw the land during my stay in that neighborhood, and while there appears to be some very good lands in the tract, yet I fully believe there is three hundred acres practically worthless. If the same could be obtained at about $12.50 per acre, I think I would purchase it. There are plenty of other lands in smaller tracts in that neighborhood that could be had at that price. I expect to return to Oregon sometime during this month, with a party of land customers, and after getting through with them, I hope to return by the way of Moscow, at which time I would like to purchase some land, therefore would be glad to receive description and prices of your best bargains.

"Yours very truly,

"WILLIAM MULHALL."

The respondents' reply to said letter is as follows:

"Moscow, Idaho, July 14, 1902.

"William Mulhall, Esq., Sioux City, Iowa.

"Dear Sir: We are in receipt of your favor of the 8th inst. The 2720 acres, including the Denver Townsite cannot be bought for a less price than we made you when here.

"We are well acquainted with every acre of this land, and know you are way off when you think there are 300 acres of it practically worthless. 125 to 150 acres might be so classed, but that carries a stream of water which adds very much to the value of the balance of the land. We have very little low priced land in this county that is good. We have sold an enormous amount of land since you were here, and the prices are steadily advancing. If you come this way on

your return from Oregon we will be glad to show you what we have.

"Yours truly,

"SPOTSWOOD & VEATCH."

Mulhall returned to Idaho in the fore part of August, 1902, and again went out and examined the land. On his second trip he had another interview with Schleicher and he priced said lands to him at that time at $20 per acre, and after some negotiations he sold the lands to Mulhall for $46,240, that being a little less than $17 per acre; $5,000 of the purchase price was paid in cash, and $11,240 thereof was to be paid on the first day of March, 1903, and the balance of $30,000 was to be paid on or before three years from August 15, 1902, with interest on deferred payments at the rate of eight per cent per annum. Mulhall had not seen either of the respondents from the time he met them in Moscow on May 31, 1902, until some time after the sale was made on the 15th of August, 1902.

Mulhall testified that he was never ready or willing to pay $17.50 per acre for said lands, and the evidence shows that the appellants had not offered the land to him for less than $17.50 per acre until the 15th of August, when he declined to give them to exceed $17 per acre, and they accepted that offer. These facts show that the appellants received for said land every dollar that Mulhall would pay therefor—was ready and willing to pay therefor. It must be borne in mind here that it is alleged in the complaint, and admitted that if the land was listed at all with the respondents it was listed as follows: The appellants were to receive a net of $17.50 per acre for the land and reserve the crops growing on the lands in the year 1902. It is alleged in the complaint, and contended by counsel for respondents that they had procured a purchaser for said land on the terms last stated, but the evidence is clearly against that contention. The evidence shows that Mulhall was never ready or willing to pay to exceed $17 per acre for said land. Conceding, for the purposes of this case, that said lands were listed for sale

with the respondents by appellants, respondents failed to show that they had procured a purchaser who was ready and willing to pay the list price for said land.  There is nothing in the record showing, or tending to show, that the appellants have in any manner attempted to overreach or beat the respondents out of any commissions that they were entitled to receive because of their procuring a purchaser for said lands.  In fact, the evidence shows that B. F. Morris was a real estate agent himself; that he advertised largely and sent printed lists of the lands that he had for sale over the country, and that he sent one of those lists to Mulhall, the purchaser, and that that advertisement first called Mulhall's attention to the land.  Mulhall did not know of Spotswood and Veatch until he had reached Moscow, Idaho, on his way to examine said lands, and there accidentally met them.  On making inquiry for an uncle that he had lost trace of, he was referred to the respondents as old residents, and having a wide acquaintance in and about Moscow, and he informed them of the purpose of his visit to Idaho, and they gave him a letter of introduction to B. F. Morris.  Under that state of facts it is clear that they did not call Mulhall's attention to this land, but that B. F. Morris did so.

It is contended by counsel for appellant that it was the letter of July 14th that made Mulhall "ready and willing" to pay for said land the list price, to wit, $17.50 per acre, reserving that year's crops and five per cent commission for the respondents.  I cannot agree with counsel on that point. The difficulty is, the uncontradicted evidence shows that he was not ready and willing to pay said price or that they induced him to purchase said land.  The record shows that the respondents are keen, shrewd business men, and that they procured the very largest price that it was possible to procure from said Mulhall for said lands.  The respondents certainly had confidence in the business ability of the appellants, as they paid no attention whatever to Mulhall after giving him the letter of introduction to Morris dated May 31, 1902, until they received his letter of July 8th.

To recapitulate: Mulhall, the purchaser, had, in April, 1902, received a letter from B. F. Morris containing a circular list of land, which list called the particular attention of Mulhall to the Denver Townsite Company land, and in response thereto, he left his home in Sioux City, Iowa, and traveled about two thousand miles on his way to inspect said land, and went into the office of the respondents at Moscow, Idaho, to make inquiry in regard to an uncle whom he had not heard from for years, and while there informed the respondents of his mission to see B. F. Morris and inspect said land. Respondents thereupon informed him that they were well acquainted with Morris and would give him a letter of introduction to him, which they did. Can it be contended with any reason under that state of facts that respondents procured Mulhall as a purchaser? He had concluded to go and inspect said land more than a month before he met respondents, having had his attention called to it by B. F. Morris, and had proceeded about two thousand miles on his way to see the land before he accidentally, or incidentally, met respondents.

Those are the undisputed facts. Respondents were informed by Mulhall that he was on his way to see said land. The giving of said letter of introduction was a work of supererogation, and for the evident purpose of laying the foundation for a commission.

The respondents had no more right to appropriate as their own a purchaser found by appellants than appellants had to appropriate one found by respondents, provided the land had been listed with them. There must be a little honor between real estate agents. If Mulhall's attention had been called to this land by respondents, no court would permit appellants to appropriate him as their own purchaser; neither will respondents be permitted to claim as their purchaser one procured by appellants (provided the sale was not brought about by the efforts of respondents).

Mulhall evidently was a keen, shrewd man—a real estate agent—and his letter of July 8th indicates to me that he had

concluded to purchase said land, and the letter of respondents of July 14th to him did not influence him to make the purchase. It is sufficient to say that Mulhall was a purchaser procured by Morris, now deceased, and not by respondents.

The judgment is reversed and the cause remanded, with instructions to dismiss the action.

Costs are awarded to appellants.

Stockslager, C. J., concurs.

AILSHIE, J., Dissenting.—I agree with my associates in much that is said in the very exhaustive opinion by Mr. Justice Sullivan, and still I find much there said that I cannot agree with. This is the second hearing of this case and the second opinion filed. I expressed my view on the original hearing as to the powers and authority of the secretary and trustee of this association, and also expressed doubts as to whether such an association can lawfully exist under our constitution and enjoy any rights, privileges or immunities other than or superior to those enjoyed by partnerships and individuals. I have had no occasion to change my mind on this matter since the first hearing. It is clear, however, to the merest layman that the majority of the court have given recognition to a hybrid business organization—half corporation, half partnership. For the purpose of avoiding liability when creditors pursue it, we are assured that it enjoys such of the powers and privileges of a corporation that its partners are not liable for debts incurred by its officers and agents unless specially authorized by a meeting of the shareholders, nor are they liable for debts incurred by partners (or "shareholders," as they please to call themselves). On the other hand, when confronted with the necessity of incorporating under the law before exercising or enjoying any of the privileges or functions of or common to a corporation, we are told they are merely a "limited or special partnership." Such an easy, elusive and facile organization, without identity or conscience, will render the much hated corpo-

ration a mere dwarf in the sight of such manifestations of power and immunity from liability. Aside from being entirely useless and unnecessary, it would be equally as tedious and laborious (far beyond the time at my disposal) for me to undertake to go through and point out wherein I agree and where disagree with the opinion of the majority. I will content myself by saying I concur in part and dissent in part.