**WEST SIDE OIL CO. v. McDORMAN et al.**
**(No. 1966.)**

(Court of Civil Appeals of Texas. Amarillo. Oct. 4, 1922.)

**1. Appeal and error ⬅➡662(1)—In absence of suggestion of diminution of record or request to perfect, record must be taken as found.**

Where, on appeal, there has been no motion suggesting a diminution of the record or a request to perfect the record, the appellate court must take it as it finds it.

**2. Pleading ⬅➡253 — Method of answer to amended petition held not in accordance with rules.**

Where an answer to an amended original petition is filed wherein the prayer is similar to that in the first amended original answer, and the original answer is relied upon as presenting the issues in part, such method of answering is not in accordance with Rule 6 et seq., District and County Courts, nor with the statutes with reference to pleadings.

**3. Joint-stock companies and business trusts ⬅➡15(1)—Creation of trust limiting stockholders' liability unauthorized.**

The statutes exclude the power to create a trust by a joint trust or stock association in which it is sought to limit the liability of stockholders.

**4. Joint-stock companies and business trusts ⬅➡19—Unincorporated trust association held partnership.**

Where the articles of an unincorporated trust association authorized the stockholders to elect trustees, fill vacancies, and the like, a partnership existed, every member of which was liable for the debts of the concern, which might be sued by name and service on certain officers under Rev. St. tit. 102, c. 2, and judgment taken against it under Rev. St. art. 2006.

**5. Partnership ⬅➡68(2)—Firm real estate as part of capital stock considered personalty in equity but not in law.**

While real estate of a partnership in treatment is said to be converted to personal property when held as part of the capital stock, this is so only in equity and not in law.

**6. Joint-stock companies and business trusts ⬅➡18—Articles of agreement of unincorporated trust association held controlling as to powers of members.**

Although an unincorporated trust association was in fact a partnership, the general power of one partner as agent to bind other members held not controlling under the articles of agreement, but the powers were such as were fixed by the articles, and the acts of the trustees thereunder bound the association and the stockholders.

**7. Mines and minerals ⬅➡101—Trustees of unincorporated trust association held authorized to convey interest in property.**

Where the articles of agreement of an unincorporated trust association for dealing in oil leases provided for trustees to be elected by the stockholders and prescribed their duties, held, that a majority of the trustees could enter into an enforceable contract to convey a half interest in the property of the association to the end that oil should be produced therefrom in accordance with the purpose of the association.

**8. Joint-stock companies and business trusts ⬅➡18—Ratification of trustees' agreements by implication must be based on knowledge of facts.**

An unincorporated trust association, in the matter of ratification of contracts by its trustees, is governed by the same principles as are individuals, and it is necessary to show knowledge, or facts from which knowledge may be inferred, to find ratification by implication.

**9. Joint-stock companies and business trusts ⬅➡18—Trustees may ratify by acquiescence without formal action.**

The trustees of an unincorporated trust association may ratify by acquiescence, and need not act at a meeting regularly called, but may ratify without any formal action, and, where the act is beneficial to the association, the

presumption of ratification will arise from slight circumstances.

**10. Specific performance ☞41—Oral contract for purchase of land enforced when possession has been given, price paid, and permanent improvements made.**

A court of equity will enforce specific performance when the vendee under an oral contract has been placed in possession of land and the purchase price paid and he has placed thereon permanent and valuable improvements.

**11. Specific performance ☞41—Oral contract for sale of interest in oil wells held enforceable on part performance.**

An oral agreement between trustees of an unincorporated association and plaintiffs, whereby plaintiffs were to clean out certain oil wells so as to make them producing wells, in consideration for a half interest in the lease, *held* specifically enforceable; plaintiffs having taken possession, performed labor, and added permanent improvements to the land.

**12. Specific performance ☞42 — Possession and improvements held to be on faith of oral contract, though a subsequent written contract was to be made.**

Where the trustees of an unincorporated association agreed orally with plaintiffs to the sale of an interest in certain oil leases, a written contract therefor to be subsequently made, the execution of the writing was not a condition to the oral contract, and the possession taken and improvements made were on the faith of such oral contract.

**13. Mines and minerals ☞55(3)—Lease held not to convey oil in place, but merely to confer on lessee license to go on land to produce oil.**

Where an oil lease authorized lessee to go on the land and use it for the production of the oil as long as it could be produced in paying quantities, the lease did not convey the oil in place, but only gave lessee a right, easement, or license to go on the land to produce oil.

**14. Trial ☞219 — Definition of acquiescence held unnecessary in suit on contract conveying interest in oil lease.**

In a suit for specific performance of an oral agreement whereby trustees of an unincorporated association were to convey an interest in certain oil leases, other trustees having acquiesced in such agreement, it was not necessary to define the word "acquiescence," it being a word of common use, although no injury resulted from giving a definition generally accepted by lexicographers.

**15. Mines and minerals ☞101—Ratification of conveyance of interest in oil lease by trustees of association held for jury.**

Where the question of ratification of an oral conveyance by trustees of an unincorporated association of an interest in an oil lease depended on inference of facts from conduct and whether a reasonable man might infer assent from the circumstances, the question was one for the jury.

**16. Trial ☞362 — Court must accept actual findings of jury on questions submitted.**

Where the jury have made actual findings of fact on issues submitted to them, the court must accept the findings as made in view of Rev. St. art. 1990, and cannot change them so as to find what the jury intended to find.

**17. Specific performance ☞117—Amount paid by receiver not joined held not properly an issue in case.**

In a suit to enforce an agreement for the conveyance of a half interest in an oil lease, the amount paid by a receiver to the purchasers under order of court *held* not properly an issue in the case; the receiver not being joined.

**18. Interest ☞9—Joint-stock companies and business trusts ☞18—Acceptance and use of money held proper basis for allowance of interest; no ratification from use of money without knowledge of contract.**

Where the trustees of an unincorporated association sold an interest in certain oil lease, receiving part payment therefor, failure to return the money so paid *held* not to work a ratification, in the absence of knowledge of the contract on the part of the association, but will establish the relation of debtor and creditor so that interest would be recoverable thereon under Rev. St. art. 4977.

**19. Pleading ☞48 — Body of petition determines whether cause of action stated.**

In determining whether a petition discloses a cause of action, the court must look to the body of the petition, and not to the prayer for relief.

**20. Specific performance ☞120—Evidence held admissible to show condition of property purchased.**

In a suit for specific performance of an oral agreement to sell an interest in an oil lease, testimony by one of the fee owners of the land with reference to ousting lessee on the ground of abandonment *held* admissible as showing the condition of the property.

**21. Specific performance ☞120—Evidence as to abandonment of oil lease sold held admissible.**

In a suit for specific performance of an agreement to sell an interest in an oil lease, evidence as to abandonment of the lease *held* admissible.

**22. Specific performance ☞120—Evidence as to royalties paid under oil lease transferred held immaterial.**

In a suit for specific performance of an agreement to sell an interest in an oil lease, evidence as to royalties paid under lease *held* immaterial.

**23. Evidence ☞121(3)—Letters of defendant's secretary held admissible as res gestæ to show contract.**

In a suit against an unincorporated association to specifically enforce an agreement to sell an interest in an oil lease, letters by the secretary of the association *held* admissible as part of the res gestæ and of the negotiations to show the terms of the contract.

**24. Appeal and error ☞1050(4)—Evidence admitted without proper foundation held not prejudicial.**

In a suit against an unincorporated association for the specific performance of an agree-

ment to sell an interest in defendant's oil lease, admission of evidence by one of the plaintiffs that a third person wanted to buy him out and that plaintiff refused to sell, while erroneously admitted without a showing that such person was acting on behalf of defendant's trustees, *held* not prejudicial.

**25. Appeal and error ☞747(3)—Cross-assignments not filed nor brought up by record may not be considered in absence of permission by appellant.**

Where cross-assignments are not filed in the trial court nor brought up with the record, they are not to be considered by the appellate court unless appellant agrees thereto.

Appeal from District Court, Wichita County; E. W. Napier, Judge.

Action by C. R. McDorman and another against the West Side Oil Company. Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

Martin & Oneal and Weeks, Morrow & Francis, all of Wichita Falls, for appellant.

Hunter & Scott, of Wichita Falls, for appellees.

HUFF, C. J. Appellees, McDorman and P. W. Cunningham, composing a partnership styled McDorman & Cunningham, sued the appellant, West Side Oil Company, as an unincorporated trust association, alleging its trustees to be J. A. Staley, R. W. Ramming, W. T. Willis, J. C. Davis, J. J. Hill and T. C. Scruggs. It is alleged in effect on the 16th of March, 1920, the appellant company, through its trustees, were seized of all of block 5, in Wigham's addition to the town of Burkburnett; that prior to that time the company had two oil producing wells on the lot, but due to neglect, misuse, etc., the wells had run down and were not producing, and at said time were not being operated for oil or any other purpose, and the operation thereof had been abandoned by the officers, and that the property was considered by them as valueless and the personal property thereof deteriorating in value, and in danger of being lost; that the lease on the lot attached was upon the condition that appellees operate the lease for the production of oil for so long as oil could be produced in paying quantities; that the owners of the fee to the lots during the early part of the year 1920, on account of the abandonment by appellant of operation on the lease threatened to bring suit and cancel the lease, which was known by all the trustees. It became necessary for the trustees to take some action to preserve the lease and save same from forfeiture for abandonment. Appellees were advised and allege the fact to be that three of the trustees above named, to wit, Davis, Hill, and Scruggs, failed and refused, though requested by the president of the company, to

take any action for the preservation of the property and fulfillment of the trust, but wholly abandoned their trust, leaving only three trustees, Staley, Willis, and Ramming, as trustees acting for and in behalf of the appellant company.

On the 16th of March, 1920, after abandonment by the three trustees, as aforesaid, the appellant acting through its remaining trustees employed appellees to go upon the leasehold estate and clean out the wells upon the property, and at their own cost and expense to operate the same for the production of oil thereafter, agreeing orally that in consideration of the services of the appellees in that behalf that they the trustees, would convey or cause to be conveyed to appellees for their services thereon seven-sixteenths of the oil produced therefrom, agreeing and binding appellant to convey or cause to be conveyed to appellees an undivided one-half interest in and to said oil and gas lease, subject to an overriding one-eighth royalty, and also to convey the equipment, tools, machinery, and appliances belonging to and connected with the oil lease.

That appellants, acting through its said trustees, placed appellees in possession of the property above described, and that they took possession and entered upon the performance of their agreement and in compliance therewith expended large sums of money in the improvement of said property to the extent of about $6,000. After working on the wells as they had agreed to do for about 35 days, they brought the wells thereon to a condition where they began to produce oil to about 12 barrels per day, which was the result of their labor, skill, and effort, together with the money expended thereon. They further allege, on information and belief, the trustees had abandoned the property and their trust; that they knew the terms and conditions of the employment and knew that the appellees were relying thereon, expending money, and performing work, labor, and time in improving the property, and that said trustees thus knowingly stood by, acquiesced therein, and made no objection thereto, knowing appellees were expecting from appellant the fulfillment of the agreement above set out; that said trustees estopped themselves and appellant company, so far as their veto powers in that regard extended, to object to the execution of the agreement and the carrying the same into execution and full force and effect. They further allege they were advised and believed, and upon such they allege the fact to be, that the term of office of the three nonacting trustees had expired sometime prior to the contract, and that by the terms of the articles creating the association their term of office had expired on the 1st day of September, 1919, which should continue thereafter until their suc-

cessors were elected; that said trustees had acquiesced in the expiration of their term of office, and had not attempted to act in that capacity for many months prior to the execution of the agreement and were not when it was executed acting as trustees under the continuing clause in the articles of the trust and were not de facto trustees.

In the second count it is alleged that about April 20, 1920, appellees being then in possession, occupancy, and control of the premises and under the terms of their agreement entitled to and did equitably own seven-sixteenths interest therein. On said day the acting trustees for appellant recognized appellees had performed their agreement and were the equitable owners of seven-sixteenths interest and thereupon entered into a second contract, in writing, whereby appellant, acting through Staley, Ramming, and Willis, contracted and agreed to sell and deliver to the appellees the remaining one-half interest belonging to appellant in and to the oil and gas lease for the sum of $8,500. Appellees thereby agreed to buy the same, the terms being one-half cash, and the remaining one-half to be paid when the assignment was made to appellees. The appellees thereupon paid appellant $4,250, which it accepted and received and at which time appellees were in possession and making valuable improvements on the land, all of which facts were known by Davis, Hill and Scruggs, who remained silent and raised no objection and thereby estopped themselves and the appellant company in so far as they had a veto power. Reference is made to the contract in the pleadings for its terms, etc. That the contract was executed for the purpose and with the intent of all the parties thereto to vest in appellees all and singular the entire interest of whatever nature, belonging to appellant company in and to the oil and gas lease.

The improvements first contracted for and the services for which appellees were first employed were necessary to preserve the estate from forfeiture, and to retain the value of the property. Appellees and the officers with whom they contracted were acting in good faith and to prevent forfeiture, loss, and deterioration. That the contract was equitable and for a fair and valuable consideration. That under the articles of the association the trustees signing the written contract were the only persons legally qualified to act for the appellant company, and that the contract entered into is legal and binding. It is also alleged the appellees went into possession of the property under the agreement and in pursuance thereto improved the land and operated the wells for production, and that their expenditures amounted to about $11,285. In addition thereto they had paid $4,250 for the remaining one-half interest in the lease, and stood ready and offered to pay the remainder, $4,250, upon a transfer of the lease upon a written contract. That the appellant refused to make the transfer. The prayer is for specific performance. If the contract to convey is nonenforceable, then for the value of the time, the value of the property placed thereon, and the amount of the purchase money paid by appellees to appellant thereon, etc. The only answer we find in the record and upon which the case apparently went to trial is that of T. C. Scruggs, J. C. Davis, and J. J. Hill, as trustees. Their answer does not specifically purport to be for the appellant association or the other three trustees thereof, nor is there any allegation that they were authorized by the board of trustees to defend the association in the name of the three trustees answering. However, there appears to have been no question in the court below or in this court of their right to defend in their name and to prevent judgment against the association by default or otherwise. The association joins in the appeal, and all six of the trustees sign the appeal bond. It is asserted by the appellees in their brief the other three trustees answered, but their answer does not appear "in the transcript for some reason, not necessary to this discussion."

[1] There has been no motion suggesting a diminution of the record, or asking to perfect the record. We must, therefore, take it as we find it, and will have to treat the case as if the appellant association, as such, duly appeared and answered. The three trustees answering the amended petition upon which the trial was had denied generally the allegations therein. They also allege the $4,250 check which appellees delivered to Staley was not intended to be cashed by the association, and that it did not, through the majority of its trustees, receive or accept the same. That by the terms of the contract made with Staley the check was not to be cashed and the money delivered to the association, but was to be held in escrow with the contract until the title was accepted as good and merchantable by the appellees, "but by a mistake on the part of Reid, secretary and treasurer of the defendant company, said check was cashed and placed to the credit of the West Side Oil Company."

That appellees have received $5,000 in cash from the sale of oil produced from the lease, and appropriated to their own use. That the association is and has always been ready and willing to refund to the appellees the $4,250, and alleges a tender of the same into court when and upon appellees refunding to defendant company the $5,000 so received. That a reasonable compensation for appellees in cleaning out the wells is $1,500, which the company here tenders as payment for the work. That appellees agreed with Staley that if he (Staley) should fail to deliver

within 30 days' time an assignment conveying a good and merchantable title to the property that the $4,250 was to be returned to appellees, and in such event appellees agreed to accept the usual and customary compensation for their services in cleaning the wells, etc.

[2] The answer just epitomized is in answer to the amended original petition, and in the prayer they pray as in their first amended original answer. We take it from the briefs that the original answer filed by these trustees was relied upon as presenting the issues at least in part. This method of answering is not in accordance with the rules or statutes with reference to pleadings. Rule 6 et seq., District and County Courts (142 S. W. xvii). The effect of the answer originally filed in part is as follows: That the old contract made on the 16th of March, 1920, set out as having been made by the other trustees; that the answering trustees were not consulted in making that contract, denying also that it was ever made; alleging that if their cotrustee, Staley, entered into such contract by which an interest in the leasehold estate or other property of the West Side Oil Company was to be given to the appellees for cleaning out the wells, that the same was made without the knowledge or consent of the three trustees answering, and that the same was made in violation of the articles of the association of said West Side Oil Company, and without authority from the stockholders, and without authority from the board of trustees of said company, acting as such board of trustees; that the consideration therefor was inadequate and unreasonable, and against the interest of the stockholders of the company; alleging that $1,500 was an adequate compensation of the work done by appellees; that the answering trustees had continually refused to join in the execution of any kind of contract or assignment conveying any part or interest in said company to the plaintiffs, and that appellees knew that Staley did not have authority to make the contract or sale with them; denying, also, that appellees made any valuable improvements upon the lease, and alleged that without authority from the company they had gone upon said lease and voluntarily expended money in cleaning out the wells and operating the lease; that under the articles of the association under which the company was acting the trustees had no authority to sell the lease or any part thereof, except under a resolution passed by a majority of the board of trustees authorizing the sale, and that no such resolution had at any time been passed or spread upon the minutes of the board.

The case was submitted to a jury on special issues. The jury found that J. A. Staley employed the appellees to clean out the wells; that he made the contract in good faith; that the condition of the wells was such as to demand and make necessary the work and labor performed by the appellees thereon; that a majority of the trustees knew during the time of the cleaning out of the wells of the contract and the terms thereof, whereby the appellees were to have one-half of the oil produced from said lease for their services if oil was produced. While the appellees were cleaning out the wells, the trustees did not object thereto. That a majority of the trustees, knowing the services the appellees were performing, accepted the benefit of their work and the improvements on the lease.

G. S. Reid was duly qualified and acting secretary from March 16, 1920, to April 20, 1920. That he was given full notice on or about March 17th of the terms and conditions of the contract made by Staley for the employment of plaintiff to do said work, and the terms of their pay therefor. That a majority of the trustees of the association acquiesced in the making of and to the terms of the contract, the employment between Staley on the one part, and appellees on the other, knowing the terms thereof. That $5,500 would reasonably compensate appellees for the labor and services performed by them, the improvements made by them upon the lease in question, and the money expended by them for material incident to cleaning out and repair of the wells, and of the operation thereof from the time of making the verbal contract to April 20, 1920. That $11,833 would reasonably compensate the appellees for the value of their services and labor performed and money expended by them in the improvements and operation of the lease in question subsequent to April 20, 1920, and prior to the 16th of October, 1920, the date of the appointment of a receiver of said company.

That the trustees, J. C. Davis, J. J. Hill, and T. C. Scruggs, failed and refused to act in their trust capacity for the benefit of the appellant company on request to do so before making the written contract in question.

The jury also found, under an instruction requested by the appellants and given by the court, a verdict against appellees on their cause of action based upon the written contract dated April 20, 1920, signed by Staley, Ramming, and Willis.

Upon these findings the trial court rendered judgment in favor of the appellees for one-half of the oil lease and oil production and one-half of the appellant's machinery and material on the property, placed there by appellant.

The articles or instrument bringing into existence the appellant company was executed by R. W. Ramming, W. T. Willis, J. A. Staley, T. C. Scruggs, J. J. Hill, J. C. Davis, and Guy S. Weathers, by which they declare, "We hereby form an unincorporated joint-

stock association, to be known and styled West Side Oil Company," which was to continue in existence during the lives of the above-named parties "and for twenty-one years after the death of that one of said persons who last dies," unless sooner dissolved as provided in the instrument. The principal office of the company was to be at Wichita Falls, Tex., where its business was to be carried on, and in such other place or counties in Texas as the board may determine. "The general purposes of the company are to purchase lease contracts for oil and gas purposes, to own, hold and mine lands supposed to contain, or containing oil or gas and other minerals, and to sell and market or refine same, and to carry out their purpose shall have authority generally to construct pipe lines, tanks, oil refineries, and to do any such other things as may be necessary to carry out the purpose of the association." The capital stock was $60,000, divided into 600 shares of $100 each, which could be increased by a vote of the majority of the shares then issued and outstanding at any meeting of the shareholders. Preference was given to shareholders to purchase certificates issued for the increase, provided for the form of certificates to be issued, and reciting therein that no member of said company or owner or holders of the certificates as such should have any right or authority to transact any business whatever for or in behalf of the company, and that the shareholders should not be personally liable for any debt, covenants, demands, or contracts of any kind, etc. It gave the shareholders the right to vote and provided by article 5:

"Shareholders in this company shall have no legal right to the trust property held from time to time by the trustees herein provided for, and especially shall they have no right to call for any partition of the trust property or dissolution of the trust, but the shares shall be personal property, carrying the right of a division of the profits and at the termination of the trust by the expiration of the period fixed for its existence, or dissolution otherwise, the shareholders shall be entitled to a division of the principal and the profits in due proportion to the numbers held by each."

It is provided, also, that death, insolvency of members, or transfer of shares of stock, should not work a dissolution or have any effect upon the same, giving a right to the holders of the stock transferred the same as the original stockholders or members had thereunder. The seventh article:

"The entire affairs of the company shall be managed by the board of trustees, consisting of seven members, each of whom shall own at least a certificate of membership in the company, of not less than one share."

The first board of trustees, designated by the instrument, are composed of the original signers of the articles of association, named in that instrument, and were to continue until their successors were elected, as provided by the articles.

"Each subsequent board shall be elected by a majority of the shares present or represented at a meeting of the shareholders, to be held annually on the 1st day of September, or as soon thereafter as practicable," and to continue in office for one year, or until their successors should be elected. The board was to elect its president, secretary, treasurer, etc. "The title to all property acquired or to be acquired from time to time shall be made and held in the name of the trustees, as such, the survivor or survivors of them under a declaration of trust on behalf of the company. Such trustees shall hold such property as joint tenants, and not as tenants in common upon the trust and with the powers herein stated. The trustees in their capacity as such may sue and be sued in any court of law or equity, and the company may sue or be sued in the company name, as provided by the statutes of Texas. The trustees shall, by a vote of the majority of the board have full authority to conduct the business and affairs of the company, to purchase contracts for lease, or otherwise acquire any property necessary and proper for the purposes of the company; to sell or convey any part of the property of the company; to make all necessary repairs, extensions and additions; to borrow money on the credit of the company, and if deemed advisable issue mortgages, debentures therefor secured by a mortgage or deed of trust upon the property of the company, executed in such terms as they may deem proper, and in general all things which, in their judgment, are necessary and prudent in the management and conduct of the business of the company," providing also that the debts incurred shall be charged upon the property of the company, and in case of the death or resignation, creating a vacancy, of a member of the board, the remaining members were to fill the vacancy "subject to the right of the shareholders to do so instead should they see proper to exercise the right, the survivors of the trustees or in case of resignation, the remaining trustees shall have all the powers and rights to exercise all of the functions of the full Board until the vacancy or vacancies are filled."

It is provided that the trustees should have no power to bind the shareholders or members personally. The property of the company is to stand primarily charged with the payment of its debts, judgments, contracts, etc. It provides also for adopting by-laws and for annual meetings of the shareholders. The articles of association may be amended by a three-fourths vote of the shares present or represented, and by-laws may be adopted, repealed, or amended by a vote of two-thirds of the shares present or

represented. A majority of the outstanding shares must be represented at the meeting. The share or certificate holders shall meet annually without further notice to direct the affairs of the company, or which may be submitted to them by the board. The trustees were empowered to call special meeting, but if they failed or refused to do 'so one-fourth of the shareholders may themselves' call the 'meetings. "The members of the board or trustees shall at all times be subject to the orders of the shareholders, who may at any time and for any cause, by a vote of the majority of all the shares then issued and outstanding remove any one or all of them from office, and appoint and devolve upon other members the duties and functions of the office. All conveyances of real estate shall be made by a majority of the trustees, as such, under authority of a resolution of the board, or the president or vice president of the company, under like authority." It is also recited in the articles that it was the intention of the signers thereto, who owned certain oil leases in Wichita county, Tex., to transfer to the company all oil and gas leases situated in Wichita county, Tex., to wit: All of block 5, in the G. W. Wigham addition to the town of Burkburnett, Tex. In consideration of the conveyance of the oil and gas lease the parties who executed the trust agreement were to receive $39,000 to pay for the lease; $6,000 to pay for commission and the selling of stock, etc. It provides that a dissolution of the company may be effected by a vote of three-fourths of all the membership certificates or shares then issued and outstanding. The articles of trust are dated the 25th day of September, 1918. On the same day the above-named parties, for themselves and successors, under the trust, declare that they hold all the property, real and personal, or of any species, conveyed or granted in any way coming to them as trustees for the company, subject to the articles of association and by-laws, now or thereafter adopted by the company, and upon trust and conditions and subject to all the conditions and stipulations and provisions of the articles of association. These two instruments were acknowledged by the parties, but not recorded.

The evidence in this case will justify the finding that the appellant company, through its trustees, held the legal title to the lease on the block of land in question, that they put down two oil wells on the land and produced oil therefrom until some time about October, 1919, when the wells ceased to produce. The fee owners were dissatisfied with the conduct of the company, and placed the matter in the hands of the attorneys, who notified the trustees, Staley, Davis, and possibly others. The action threatened by the attorneys was to cancel the lease on the ground of abandonment. After receiving the notice three of the trustees, Davis, Willis, and Staley, visited the attorneys and assured them that they had not abandoned the lease, but would go to work on it. According to Davis, after that he did nothing and did not offer to do anything or suggest anything to the trustees, or insist upon a meeting or upon any action, but excused himself upon the ground that he was not manager. J. A. Staley was the president of the board of trustees from the time of its organization up until the time of the bringing of this suit and the time of the trial. He said they had one meeting of the trustees, at which Weathers, one of the named trustees in the articles of association, resigned as trustee, and that no other was elected in his place, and that there were only six trustees remaining, Ramming, Scruggs, Davis, Staley, Willis, and Hill. Staley testified that Davis was manager during the time the wells were producing, and' at the time they were shut down. "Davis had the matter of management and nobody paid much attention to it, except, I think, he had No. 2 shot out there, and he said they shot a seat out and made water, and the well we thought was ruined, and No. 1 was not very much account, and we just happened to meet and discuss it, and the idea was we would not pay any more money on the lease, but would sell it if we could." He states also they did not think it worth paying any money out on. "We thought it was ruined." There was no arrangements about having a meeting to determine if they would have the well repaired, they only just discussed it on the street. "It was kind of a dead issue at the time."

The testimony shows that Davis, Willis, and Staley all officed in the same building, and the evidence justifies the inference they conferred informally on the street and in their offices about the wells, and the fact is quite apparent that none of the trustees were willing to spend money to bring them back to production or to use money of the company which was then in the treasury. It was understood they would probably lose the lease, and perhaps the material used by the company on the lease or in the wells, unless it could be salvaged. It is made reasonably certain by Staley's testimony that it was his purpose to salvage as much for the company as possible before the lease was abandoned. The jury was justified by the silence and nonaction, as well as the absolute neglect on the part of all the trustees that they regarded at the time of the oral contract the well as worthless and the lease of no value. If the trustees had not absolutely abandoned their trust, the evidence shows they grossly neglected it and in effect left the entire management and disposition to the president and manager of the association. G. T. Reid was the secretary of the association. It seems that Weathers was the first secretary, and

that when Weathers resigned that Reid took his place, whether elected or not the facts do not show definitely. Mr. Davis testified:

"I did not have charge of it in October, when it was shut down. Mr. Reid in a way was looking after it. I don't remember when it was shut down; I don't know how many months it was shut down. I don't think that during the time I managed the property we sold about $75,000 worth of oil out there; I don't know how much. I didn't collect the money and handle it while I was manager. Mr. Reid did that. I just managed the property out there on the leases. The funds were put in the bank and checked out by the bookkeeper. Mr. Reid ordered it; I don't know where he is," etc.

The books were not produced on the trial in this case, and the testimony indicates that the trustees, or at least part of them, did not know where the books were. Mr. Reid was not introduced as a witness, some stating they did not know where he was, and others that he was at Houston. The testimony indicates that there was never any regular meeting held by the stockholders, annually or otherwise, and indicates that the trustees called no meetings and had none. There is some testimony indicating that the secretary made an effort to get the trustees together but was unsuccessful in so far as the records show. All the business of the company was transacted by the trustees by consulting each other and getting the assent or views of the trustees informally, and without any regular meetings. The testimony shows that it was important to get the appellees to go upon the land immediately in order to preserve the rights of the association to the land, and to the property thereon, and that the appellees went upon the land under the assurance that Staley would procure a contract from the other trustees and that the others would indorse his action. Relying upon this assurance, they went upon the land, and performed their part of the contract. Staley requested them to prepare an agreement or assignment and deliver it to him, and that he would have it properly executed. This the appellees did, but this instrument was never signed. The appellees, relying upon the assurance so made, went upon the land with tools, boiler, engine, etc., and went to work thereon cleaning out the wells, working part of the time day and night. They worked at least 44 days cleaning out wells and getting them on the pump. The testimony shows such services, with tools, etc., was worth the customary price of $125 per day, or the total value of $5,500, as found by the jury. The appellees placed some additional improvements on the land, just the value or just the articles we will not attempt to state, the testimony being somewhat indefinite, but they did bring both wells situated on the land from nonproduction to production, at one time reaching 35 barrels, and at the trial the evidence indicates they were producing 29 barrels per day.

Staley sought the appellees, who owned a string of tools, engines, and the like, and who were in the business of cleaning wells and digging them, and experienced in that class of work, and employed them to go on the land and clean out the wells or to salvage the association's material on the land. He testified:

"We made the contract on a 50-50, but Mr. Cunningham had an idea, it seems, he owned a one-half interest in the lease. I told him he didn't have any interest in the lease, but he just had a working interest in there—the production. * * * I told Mr. Cunningham at the time that No. 2, I was informed, was ruined, and if he would go on there, and if it would not pay he was to pull the salvage and sell it, and we were to split it 50-50. He took possession at that time, and I have just said what I told him to do. I employed him to clean out the wells, and I suppose he went on there to clean them out. My understanding was that he was to clean out those wells if he could, and if he couldn't make them producing wells he was to salvage and we would split the salvage 50-50. In the event he cleaned out the wells and made them produce he was to receive one-half of the production. He would not have any title to the lease at all. As to how long he was to have one-half the production if he made wells out of them, I don't know, but it would naturally carry with it the life of the lease, as long as it paid, of course. I think that after making that contract with McDorman and Cunningham I talked with Mr. Willis and he knew I made the contract. Of course, the boys would be around the office—Mr. Willis, Mr. Davis and Mr. Ramming. We officed in the same building."

The association had employed Mr. Irby to stay upon the property and look after it for them prior to entering into the oral contract. The secretary, Mr. Reid, on the 17th of March, 1920, wrote a letter to Irby advising him that Staley, the president of the company, had made arrangements with parties to operate the wells, and that these gentlemen would have full charge of the matter pertaining to the operating of the property, and that the company would have no further need of his services. Thereafter he wrote a letter to Mr. Cunningham that he was advised that Mr. Staley, one of the trustees of the association, had made a contract with Cunningham and McDorman on the land in question and on a producing basis. "As a consideration for such service yourself and your partner are to receive one-half of the oil runs, paying all expenses up to such date as production shall have been obtained, and after that date one-half the expenses of operating the property." He further stating in the letter that Staley had requested them to come to the office for the purpose of drafting and executing the contract. Mr. Cunningham testified that Mr.

Staley told him the wells were not paying, and were down and out; that Staley said, "Go and do whatever you can towards fixing them up, and we will give you half of the stuff for fixing them," and he said, "Go right away, because they are ready to sue us at the present time for a cancellation of the lease, and we will make the contract just as soon as we can get to it." "I have a memorandum of the contract as I copied it while we were talking in his office; I have it here; I don't know that I can tell what the agreement was without refreshing my memory on this; I have the memorandum here and I will read it. We were to move on the West Side property, fix those wells up as best we could. If we could not fix them up, we were to pull them and pull the salvage, and sell one half of it to pay our expenses, and the other half was to go to the West Side Oil Company. If we were to fix the wells up, we were to work them over in a workmanlike manner, using our best skill to make them produce, and if they did produce we were to have one-half of the oil, one-half of the equipment, and one-half of everything. That is the way this contract was drawn up, and Mr. Staley told me to take these notes and have the contract prepared from these notes which I have here, which I did. After the wells were worked over, in case we got production, we were to operate the wells, being in our charge all the time. We were to pay half the expenses, and the oil company was to pay the other half. In fixing them up we were to pay the expenses. McDorman and Cunningham were to pay all the expenses until the wells were producing. I made that agreement with Mr. Staley, president of the West Side Oil Company, in his office. We went on that lease just as soon after that as we could get there; I think the same day. I had the tools moved there."

He further stated that they went to work, fixing those wells up, "expecting that one-half of them was ours, and we gave them the very best we had," fixing the wells in a good practical manner. That it cost them $5,000 or $6,000 to work the wells; that they were in bad condition. They found iron in the hole, as well as rubber and other things; that the wells had been shot into slate; almost everything that could possibly be wrong with the wells. Three of the trustees, Willis, Staley, and Ramming, the evidence we think shows, indorsed the oral contract fully. The testimony further shows, by Staley, that Davis, Willis and Ramming and himself were around the offices and talked about the contract. Ramming did not testify on the trial, but he signed the written contract to assign the entire property, and the evidence shows with a sufficient certainty that all the trustees knew this was upon the purchase of one-half by appellees other than that which they claimed to own under the oral contract. Sta-

ley says that Davis, Mr. Ramming, and himself knew about the contract. Mr. Davis in his testimony denies knowing anything about the oral contract or that the appellees were at work on the well. He admits, however, that he had a conversation with Staley when Martin said he was going to forfeit the property, and that he did not know what had been done to prevent Martin from forfeiting it. He says that if he knew of the contract it was just in a general way; that he did not know that he knew it. "That as to knowing it in a general way if somebody had mentioned it I might have heard it in that way, but I would not have known." J. J. Hill, one of the trustees, who was named in the original articles of the association, shows that he did not know whether he had been superseded at a former election or whether there had been one, and practically knew nothing about the terms of the articles of association, or the meetings, if they had any. That he was drilling and handling property all this time, and was leaving it entirely to the management of others to look after the oil wells for him, and expected them to do everything that was necessary to be done, as if he had been present, if it was satisfactory with them. He never made any objection about anything they did until September 19th. He again said he had acquiesced in everything prior to the time of the written contract, which was called to his attention in Mr. Weeks' office on the above date. Scruggs was also appointed trustee by the articles of association, and appears to have taken some part with the trustees when oil was first produced from the two wells. Possibly a year before the oral contract was entered into he moved to Mineral Wells and was occasionally in Wichita county or the Burkburnett field. He paid but little attention to the matter, and the evidence shows he did not offer to do anything or call for a meeting of the board or anything of that kind. Mr. Staley also testified that you could not get a quorum of the trustees together; that he did not know how many times Mr. Reid gave notice, but he never did get a meeting, and further states that he did not think there had ever been but one meeting, and that was when Mr. Weathers had resigned as trustee, and that they elected no other.

[3] The parties have devoted considerable space to a discussion of the nature of the articles of association; that is, whether it created a partnership or a trust. The appellant contending the pleadings must specifically allege a partnership and that the petition does not do so; the other contending the oral contract and the writing both having been made by members of the partnership who were the agents of each and all bound the copartnership, etc. As to the allegation in the petition that appellant is an unincor-

porated trust association, it is asserted in effect this necessarily negatives a partnership. Under some of our decisions this does not necessarily follow. It is apparently held that our statutes excludes the power to create a trust by a joint trust or stock association, in which it is sought to limit the liability of stockholders. McCamey v. Hollister Oil Co. (Tex. Civ. App.) 241 S. W. 689. Mr. Justice Buck concurs in that case, but limits his concurrence to the terms of the articles of association in that particular case. We call attention also to the case of Connally v. Lyons, 82 Tex. 664, 18 S. W. 799, 27 Am. St. Rep. 935. It occurs to us, however, that if the contract as alleged as having been made by the trustees, whether as a partnership, trust association, or unincorporated joint-stock association, had the effect of passing to appellees the title or an interest in the property, it is immaterial whether the nature of the association is alleged or not. The inquiry in this case is as to the rights or title to the property, and not the liability of the stockholders as such. We do not believe it important in considering the question involved to determine whether the articles are one thing or the other. However, it may be in considering the weight to be given to acts, conduct, or the evidence that the relation of the parties in their association may be in some measure affected by the nature of their association.

[4] It is our opinion, however, the articles create the relation of a partnership. It will be observed by the instrument the stockholders could elect the trustees, fill vacancies, or the like. The trustees are in a material sense under the control of the stockholders. At common law an unincorporated joint-stock company, regulated by special agreement, is a partnership. In such partnerships every member is liable for the debts of the concern, whatever private agreement they may have in their association. The members of a private association may limit their personal liability by agreement made with the party with whom they contract, and clearly understood at the time. Stipulations of that kind are not favored as being contrary to the policy of the law. 3 Kent, 26, 27. The nature of such association as above stated is not materially changed by the recent authorities. 1 Fletcher, Cyc. Corp. § 17, p. 27 et seq.; 20 R. C. L. Partnership, § 321, p. 1074 et seq.; Allen v. Long, 80 Tex. 261, 16 S. W. 43, 26 Am. St. Rep. 735; Industrial Lumber Co. v. Texas Pine Land Association, 31 Tex. Civ. App. 375, 72 S. W. 875; Oil Lease v. Beeler (Tex. Civ. App.) 217 S. W. 1054; Dee v. Tayler (Tex. Civ. App.) 227 S. W. 361; McCamey v. Hollister Oil Co., supra, and authorities cited. It is apparent the instant articles are patterned after what is generally known as the "Massachusetts Trust." It has been held in a great majority of cases that such associations are in fact nothing more than common-law partnerships or joint-stock associations, formed or organized in the nature of trusts, with capital divided into shares. See note to Malley v. Bowditch, 7 A. L. R. 612. Under the articles in the instant case, the board of trustees are under the control of the shareholders. The Supreme Court of Massachusetts holds such associations so controlled a partnership. Frost v. Thompson, 219 Mass. 360, 106 N. E. 1009; Williams v. Milton, 215 Mass. 1, 102 N. E. 355. The articles of association were entered into in Texas. It is stipulated it may sue and be sued "as provided by the statutes of Texas." Chapter 2, tit. 102, R. C. S., relating to unincorporated joint-stock associations, permits suit against such association by name and service on it by serving certain named officers. If service is had upon individual shareholders, judgment is taken primarily against the association, but is binding against the property of the member served. The judgment which may be so taken is practically the same which may be taken against an ordinary partnership or its members. Article 2006, R. C. S. In effect, title 102, c. 2, is declared to be only cumulative and does not impair existing remedies given by law. Article 6153, R. C. S. It is therefore apparent, we think, the statute recognizes the common law with reference to such associations.

[5] Appellees seem to insist land belonging to a partnership should be treated as personal property. While real estate of a partnership in treatment is said to be converted to personal property when held as part of the capital stock, this is so only in equity and not in law. Conveyances in a court of law are governed by the statute applicable to conveyances of real estate.

"Strictly speaking, the title to land can be only held or conveyed to a legal person, natural or artificial, but cannot be held by a conventional person not recognized as a distinct entity in law." 1 Bates on Law of Partnership, § 296.

"Where real estate is not a mere incident to a commercial partnership, but is the distinct substance of its business, * * * each partner by the great preponderance of authority can bind the firm by contract for disposition since the very scope of the business implies the existence of the power, * * * but it must be conveyed as real estate in all cases; that is, in the name of each partner, whether it be converted out and out into personalty or not." Id., § 299.

It occurs to us an association such as this one, for the purpose of acquiring and selling land in an oil business for profit, that the rules of law applicable to commercial partnership should apply as to its real estate. Where real estate is the subject-matter of a partnership transaction, it is considered in nearly the same manner as personal prop-

erty, and in such case the character of personalty is stamped on the property for the purpose of fixing the interest of the several partners. In such a partnership each partner has ample power as general agent of the firm to enter into an executory contract for the sale of the real estate and such contract will be specifically enforced against all the partners. 20 R. C. L. Partnerships, § 70, p. 862. It is also a recognized rule one partner may authorize another to make a conveyance or he may ratify it.

"A ratification may be inferred from the presence of the other partners at the execution and delivery, or from their action under it, or knowingly taking the benefit arising therefrom. It seems that an unauthorized execution of a deed of the partnership may also be ratified by a parol." 20 R. C. L. § 108, p. 96; Lowery v. Drew, 18 Tex. 792.

[6] However, the general power of one partner as agent to bind other members of the partnership we do not believe will control under the articles in this case, but the powers will be such as are fixed by the articles of agreement. The association by agreement or as expressed in the articles places the power in the trustees of the concern to conduct and control the business, prescribing their duties and powers. Their acts thereunder bind the association and the stockholders. Oil Lease, etc., v. Beeler (Tex. Civ. App.) 217 S. W. 1054–1057; 20 R. C. L. §§ 325, 326, p. 1077; Re Oliver's Estate, 136 Pa. 43, 20 Atl. 527, 9 L. R. A. 421, 20 Am. St. Rep. 894. In order to bind the association the trustees must act within the scope of the powers conferred upon them by the articles of association. The duties of the trustees in this case are, we think, analogous to that of directors in a corporation, or managing officers. Authorities supra; Willis v. Greiner (Tex. Civ. App.) 26 S. W. 858; Spotswood v. Morris, 12 Idaho, 360, 85 Pac. 1094, 6 L. R. A. (N. S.) 665, at page 674.

[7] It would seem under the articles of association a majority of the trustees could enter into an enforceable contract to convey a one-half interest in the property to the end that oil should be produced therefrom in accordance with the purpose of the association; it being a partnership for profit and the land being the subject-matter of the partnership, and in fact the entire corpus of its holding, except perhaps certain tools and machinery owned by the company for working the property. Such a contract would not be contrary to its purpose. By such contract it produced oil without the expenditure of money and to the benefit of the association and its stockholders. Having such power, the only inquiry is as to the mode of exercising it. In making contract for sale and in the transaction of the business there is no mode pointed out except:

244 S.W.—12

"The trustees shall by a vote of the board have full authority to conduct the business and affairs of the company * * * to sell and convey any part of the property * * * to make all necessary repairs, extensions and additions, * * * to do all things which in their judgment are necessary and prudent," etc.

It is urged by several propositions, varying in terms, that in order to show a binding and enforceable contract it was necessary to prove that a vote was taken at a regular meeting of the board called for that purpose, and a resolution passed to make a sale. The articles do not expressly so state, except as to making "conveyances." It is doubtless inferable that a vote should be taken at a meeting of the board. It does not, however, necessarily follow that the validity of the contract depends upon it being recorded in the minutes of the association kept for that purpose. The articles provide for by-laws, but the evidence does not show that any were ever adopted. The appellant apparently contends in order to bind the association on the oral contract it was necessary to show acts and conduct such as would work an estoppel. In so far as that contract is concerned the question relating to it is, if such a contract as the trustees could make, did the trustees or a majority make it or ratify it in such manner as will bind the association. At this point we are not treating the question of conveyance. The evidence, we think, supports the finding of the jury that the president of the association, Staley, made the contract alleged in good faith; that the condition of the property was such as justified it, that the trustees knew of the contract while the work was being done on the wells, accepted the benefit therefrom, and acquiesced in it. It is true "ratification and estoppel are often very closely associated and many times the terms are used interchangeably, although there is a clear line of demarcation between the two in that prejudice is a necessary element of estoppel while ratification requires no change of condition or prejudice." 4 Fletcher, Cyc. Corp. p. 3378; 1 Mechem on Agency, § 349. As soon as ratification takes place, the act stands as an authorized one and not as one whole effect the principal is estopped to deny. If there is ratification there is no occasion to resort to estoppel. Id., 349.

[8, 9] The trustees having the power to make the contract could also ratify a contract which may have been entered into irregularly. The contract was not void, but at most was only voidable. A corporation or an association such as this one is governed like individuals by the same principles of ratification. It is necessary to show knowledge or show facts from which knowledge may be inferred or presumed in order to find ratification by implication, or in accept-

ing the benefits or by a failure to disaffirm it. Davis v. Nueces Valley Irrigation Co., 103 Tex. 243, 126 S. W. 4; 'Id. (Tex. Civ. App.) 116 S. W. 633; Fort Worth Publishing Co. v. Hitson, 80 Tex. 216, 14 S. W. 843, 16 S. W. 551; Clark v. Elmendorf (Tex. Civ. App.) 78 S. W. 538; Railway Co. v. Gentry, 69 Tex. 625, 8 S. W. 98; Weathersby v. Texas & Ohio Lumber Co., 107 Tex. 474, 180 S. W. 735, 7 A. L. R. 1440; 4 Fletcher, Cyc. Corp. pars. 2203, 2204, pp. 3422, 3423. The above principle has been applied to joint-stock companies. Willis v. Greiner (Tex. Civ. App.) 26 S. W. 858 on rehearing. Rand v. Farquhar, 226 Mass. 91, 115 N. E. 286. Ratification by directors cannot be implied from their failure to disaffirm unless they had actual knowledge, but if their ignorance was due to negligence or inattention in the discharge of their duties an estoppel under proper facts may be urged against the company. 4 Fletcher, Cyc. Corp. § 2183, p. 3388. Trustees may ratify by acquiescence and need not act at a meeting regularly called, but may ratify without any formal action. See for a number of cases cited as to the rule 4 Fletcher, § 2188, pp. 3306, 3397; Knowles v. Northern Texas Traction Co. (Tex. Civ. App.) 121 S. W. 232, at pages 240, 241; Scott v. Superior Sunset Oil Co., 144 Cal. 140, 77 Pac. 817. Where the act is beneficial to an association, a presumption of ratification on the part of the corporation will arise from slight circumstances. The Knowles Case and the Davis Case, 103 Tex. 243, 126 S. W. 4, supra; Canadian Long Distance Telephone Co. v. Seiber (Tex. Civ. App.) 159 S. W. 898. It would seem when no formal meetings are held and it is the custom to consult the individuals directors or trustees, the assent of the directors so obtained would be sufficient for ratification. Indiana Die-Casting, etc., v. Newcomb, 184 Ind. 250, 111 N. E. 16, and authorities cited; Bibb v. Hall, 14 South. 101[1] et seq.

While the articles of the association contemplate a vote by a majority of the board, we do not think such provision so iron-clad that a contract will not be enforced because in obtaining the assent of the trustees it was done in an irregular manner, especially should this be true where, as in this case, formal meetings or votes were not had or taken at regular sessions in the transactions of the business of the concern. The evidence indicates that, if the trustees had not totally abandoned their office or created a vacancy, they were grossly negligent and inattentive to the business. The property was in danger of being a total loss; some action was necessary, and that speedily. The trustees never sought a meeting or called for one, and while in the field and around the wells they were

charged with knowledge that appellees were on the land and at work; no dissent was made or objection urged. It is reasonably certain Davis heard of the contract, and had agreed to spend no more money on the wells, and Staley says that he knew of the contract. The jury are sustained that a majority, that is, four of the trustees, knew of the contract and acquiesced in it, and accepted the benefits derived therefrom. Hill says he left it to others and that what they did was satisfactory to him. He evidently knew the wells were being cleaned out. Scruggs, though living away from the place, was in the field and around the wells, and if he in the remotest degree performed his trust he knew of the work, and should have known of the contract.

If the contract was made, as found by the jury, the trustees were in equity bound to make the conveyance and should be compelled to specifically perform. The requirement for a resolution to convey will not defeat the just rights of appellees thereto. A willful and wrongful refusal to adopt the necessary resolution and make the necessary conveyance will not render inoperative a contract which has been fully executed by the appellees. Unless the statute of frauds intervenes, appellees would be entitled to enforce specific performance. It was doubtless the purpose of the articles of the association requiring a resolution authorizing the trustees or president and secretary to make a conveyance of real estate to meet the requirement of the statute as to the conveyances. Neither the statute of frauds nor the articles render the contract illegal. The trustees were acting within the scope of their authority in making the contract and could make the contract. The statute requires a writing to evidence a contract of sale before enforcement in a court can be had for specific performance unless it falls within the rule of equity recognized by our courts. Such contract, therefore, is not illegal or void, but only lacking in written evidence, which the law requires before a court can compel specific performance. Simpson v. Green (Tex. Com. App.) 231 S. W. 375 (1).

[10-12] It is an established rule of equity recognized by our courts that a court of equity will enforce specific performance when the vendee under an oral contract has been placed in possession of land, and the purchase price paid, and he has placed thereon permanent and valuable improvements. Wooldridge v. Hancock, 70 Tex. 18, 6 S. W. 818; Bradley v. Owsley, 74 Tex. 69, 11 S. W. 1052; Hibbert v. Aylott, 52 Tex. 530; Edwards v. Old Settlers' Ass'n (Tex. Civ. App.) 166 S. W. 423. The appellees herein paid the agreed price in labor, material, and money, $5,500, and cleaned out the wells. They were placed in possession of the property by the only acting officers of the asso-

---

[1] Reported in full in the Southern Reporter; reported as a memorandum decision without opinion in 101 Ala. 79.

ciation, and were in control by the apparent consent of the trustees, and for 40 days openly and continuously worked on the wells day and night, without objection, protest, or any dissent manifest. They placed improvements in the way of machinery, and the like, on the land; whether as fixtures we do not determine, or attempt to give the character or value, as the evidence on that point is not quite clear to us. They, however, brought worthless wells abandoned, if not altogether practically so, to a point of profit, in their production; nonproducing wells, to producing wells. Clearly appellees added permanent improvement of value to the land held by appellant; all the value, in fact, it had to the company, that is, the production of oil, and value to appellees in the land for which they contracted, took possession and expended labor, material, and money. This, we believe, meets the requirements of the rule established by the courts and will authorize a court of equity to specifically enforce the oral agreement. Edwards v. Old Settlers' Ass'n, supra. If it is not enforced under the circumstances in this case, it would be a fraud upon appellees. It is also urged appellees did not enter on the land and make improvements upon the faith of the oral contract, but upon a promise to execute a written contract. The execution of the writing was not a condition to the oral contract, but was a promise in the nature of a covenant. The Edwards Case, supra (9, 10), answers this contention of the appellant, citing the case of Wells v. Davis, 77 Tex. 636, 14 S. W. 237.

The appellant also by proposition assails the issues submitted by the trial court and especially the fourth issue, as an invasion on the province of the jury, and that he assumed the terms of the oral contract, when in fact the evidence was conflicting thereon. The jury, by the fourth issue, were asked to find whether a majority of the trustees knew during the time of the cleaning out of the wells of the contract, and the terms thereof "whereby the plaintiffs were to have one-half of the oil produced from said lease for their services, in case oil was produced." The first, second, and third issues inquired if Staley employed appellees to clean out the wells, if he made the contract in good faith, and if the conditions of the wells were such as to demand such work. The fifth and sixth issues inquired if, while the work was being done, any of the trustees objected thereto, and, knowing of such work, if a majority accepted the benefits of the work and improvements. By the issues submitted as to making the contract the court did not request a finding as to the terms of the contract. Apparently it was the purpose of the court in submitting the issues to reserve to himself the findings as to the terms. We are impressed from a reading of the issues it was the purpose of the trial court in submitting issue 4 to have the jury ascertain if a majority of the trustees knew of the contract and its terms while appellees were cleaning out the wells. The quoted clause, it occurs to us, was not submitted as an issue or as determining the terms of the contract, but was more in the nature of identification than to state the terms. The record in this case does not bring up the lease by which appellant holds its right to go on the lease and produce oil.

[13] The oral testimony introduced without objection shows the lease authorized the appellant to go on the land and use it for the production of oil, as long as it could be produced in paying quantities. It would seem therefrom that the lease did not sever the oil from the land, that is, convey it in place, but only gave appellant a right, easement, or license on the land to produce oil. The oral contract, whether considered from Staley's or Cunningham's evidence, gave the appellees the right to go on the land and produce oil as long as the same could be produced in paying quantities, and contract a one-half of the oil so produced. This is also shown to be the contract by the letter of Reid, which Staley says is right. In other words, the appellant, by the contract, surrendered the right to go on the land to appellee to perform the covenants of the lease, retaining one-half of the product produced. True, Staley says he told Cunningham he did not have any interest in the lease, but he does admit he would have the right to go on the land and produce oil during the life of the lease. The trial court, it seems to us, used the term "lease" to represent the thing conveyed by the lease. He evidently used that term in the sense the parties intended; that is, that appellees were to have one-half the right to the thing the lease covered. The contract may not have operated to assign the lease and substitute the appellees in place of appellant in so far as the fee owners were concerned, that is, make the appellees liable to the fee owners on the covenants of the lease (Pierce-Fordyce Oil Ass'n v. Woodrum [Tex. Civ. App.] 188 S. W. 245), but it did give the right in and on the land so long as the appellant had a right thereto. The contract was not to assign the full term of the lease, but did convey one-half of the rights in and on the land.

In so far as the court submitted the terms of the contracts, as we understand the testimony, the fact so assumed was not disputed. The question as to one-half of the tools, machinery, etc., thereon used to operate the wells was not assumed or submitted. We, in the original opinion, were of the view the court had reserved for his own finding the terms of the contract as to such property. This question will be noticed under the proposition assailing the judgment.

of the court thereon. Ordinarily a principal must know all the material facts connected with the transaction. Davis v. Nueces, etc., 103 Tex. 243, 126 S. W. 4, supra. It seems to us in this case the appellant should have requested an instruction requiring the jury to find if appellant was charged with a knowledge of a contract to convey the personal property, or whether there was a contract to that end, if it desired a finding of the jury upon that phase of the case. The issues as submitted under the record made, we think, do not present reversible error. The record is strongly suggestive that the trial court was led to submit the issues as he did from the answer of Staley, and those trustees acting with him, as to the terms of the contract. However, that answer is not in this record.

[14, 15] It is contended that the court erred in the definition of "acquiescence." Reading the entire definition as given by the court, it appears to be substantially the definition generally accepted by lexicographers. It is our view that it was unnecessary to define the word in the connection in which it was used. It is a word of common use, not technical or applicable to any particular branch of learning. Iowa State Savings Bank v. Black, 91 Iowa, 490, 59 N. W. 283. But this, however, will not necessarily reverse the case, as we consider no injury could very well have resulted from defining the word. Acquiescence is ordinarily tantamount to assent or consent. The trial court, after the definition of the word, asked the jury if a majority of the trustees acquiesced in making the contract, knowing the terms thereof. In other words, did they consent to the terms of the contract after knowing them. If they did, this was a ratification. The court was not seeking to ascertain the facts establishing estoppel. It is insisted that the court should have further required the jury to find whether the trustees, knowing the facts, did not use the care and diligence that an ordinarily prudent man should have used by going to appellees and protesting such claims. If the trustees assented to the contract, knowing its terms, it made the contract. Acquiescence and waiver are always questions of fact for the jury. If, knowing the terms of the contract in this case, the trustees objected and the evidence raises the issue that they did not have a reasonable time after such knowledge within which to make their objections known under the circumstances then surrounding them, the appellant should have framed an issue presenting it. In ratification where it is a matter of inferring facts from conduct and the question is whether a reasonable man may infer assent from the circumstances, this is a jury question under all the circumstances. When they found assent they in fact found the trustees did not dissent. They, in other words, concurred in the contract made by Staley for the association. Iron City National Bank v. Fifth National Bank (Tex. Civ. App.) 47 S. W. 533.

The eleventh proposition is there is no evidence to show Reid was the duly qualified secretary. The testimony shows he acted as such. The stationery used by the association carried his name on the head of their letters as secretary. Staley swears he was secretary. The evidence is ample to show that he was held out as the secretary. The appellant or the answering trustees allege Reid was secretary and treasurer of the company. The twelfth proposition as to Reid having full notice of the terms of the contract presents no reversible error. Contention by appellant appears to be he would not have had full notice because Staley and appellees did not understand the contract alike. The objection to this charge does not seem to be urged by appellant; that is, knowledge on the part of an officer who has not authority to bind the corporation is not imputable to it. The secretary of the association under the articles had no authority to bind the company. 4 Fletcher, Cyc. Corp., § 2186, p. 3392. This finding presents no reversible error, as the findings of the jury show the trustees, or at least four of them, knew of the contract, and they called no meeting to disapprove it. 4 Fletcher, Cyc. of Corp. § 2186. The thirteenth proposition is overruled. We think the evidence sufficient to show that Davis, Hill, and Scruggs failed to act in a trust capacity prior to making the oral contract. It seems there was some request or effort made by the secretary to get the board together, possibly at the suggestion of the president. However, there is much uncertainty and doubt in the testimony, rendered so largely by the fact the witnesses did not recollect, and apparently there is an equivocation. The books of the concern were not produced, some of the trustees stating that they were lost. Under this record we think the jury justified in finding as they did.

The fourteenth proposition is overruled. We regard the evidence as sufficient to authorize a finding by the jury that it would take $5,500 for labor, material, and money expended in cleaning out the wells under the verbal contract prior to April 20, 1920.

The sixteenth and seventeenth propositions will be sustained. The jury found that $11,835 would compensate appellees for labor, money, etc., expended by them in the improvement and operation of the lease in question after April 20, 1920, and prior to the 16th day of October. On this motion we have again examined the pleadings of appellees, and it is apparent they allege the total expenditure on the wells was $11,285 from the time they began cleaning the wells until it was taken out of their possession by a receiver. The contract, according to appel-

lees, required them to clean out the wells at their own expense. After production was obtained then appellant was to bear one-half of the expense. The appellees did not specifically allege this provision of the contract. The trial court evidently accepted this view of the contract, as he submitted the expenditures from beginning the work until they were producing. On this item the jury found $5,500, and after that time the jury found $11,835. Evidently the jury overlooked the time they were to consider under the two issues. The finding that after April 20, 1920, to October 16, 1920, they expended $11,835, is not supported by the evidence. In the judgment of the trial court it is recited that it appears to the court the jury's finding on that amount is an error and in excess of the amount expended by the appellees to the extent of $5,500, which had been expended in cleaning out the wells, and the court finds the difference between the two amounts is the correct amount expended after April 20th, one half of which should be borne by appellees, and the other by appellant, which amount is $3,167.50, for which sum judgment was rendered in favor of appellees against appellant. The court could not set aside the findings of the jury and substitute his own because he finds an error on the part of the jury, and render judgment on the court's findings, instead of that of the jury. At this point we direct attention to the petition upon which trial was had. As we interpret it, the allegations are not sufficient to authorize the inference that the contract provides that appellant was to pay one-half the cost of the production after the wells were cleaned, but it would seem simply to allege that appellees were to do this work, and that they made the expenditures stated.

The eighteenth proposition, in so far as it relates to the findings of the trial court and the judgment thereon, and the nineteenth proposition, will be sustained. The trial court found, as recited in the judgment:

"It appearing to the court from the answer of the jury to the several special issues submitted to them and answered by them that the jury has found and intended to find that the plaintiffs are entitled to an undivided one-half interest in and to said oil and gas lease and oil wells thereon situated, together with a like interest to the personal property situated thereon, and belonging thereto, and that the plaintiffs are entitled to specific performance of the oral contract made on March 16, 1920."

[16] It will be observed that Staley did not testify that appellees were to have one-half the personal property on the land used in operating the wells, if the wells were brought to production. He testified they were to have one-half the salvage if production was not secured. Cunningham, who made the contract, testified that appellees were to have one-half the personal property in either event, and a one-half interest in the lease on the block of land. There does not appear to be a very material difference as to the right into and on the land; but, as pointed out heretofore, under appellees' contention, it may amount to an assignment of the lease, making the covenant of the lease binding on both parties. It was our impression, upon an original hearing, the court reserved to himself the right to find the terms of the contract, and that issue No. 4 was not submitted for the purpose of ascertaining the terms, but merely submitted to ascertain if the appellant or the trustees ratified the contract, and simply referred to the one-half interest in and on the land as a means of identifying the contract. But by the judgment of the court it is recited the jury found and intended to find, in answer to the several special issues set out, the facts above recited. The jury certainly did not find the terms of the contract in answer to any of the issues. The court does not himself find the terms, but finds what the jury intended to find. The findings of the jury can be held only to have answered the issues submitted to them, and there is no issue submitted requiring them to find the terms of the contract. The court does not himself purport to find the issue, but expressly disclaims having done so, imputing such finding to the jury. We therefore cannot impute to the court a finding which he disclaims having made. It follows there is no verdict by a jury or a finding by the trial court sustaining the judgment entered. The court cannot in such way change the actual findings of the jury, but must accept the findings as made. Article 1990, R. C. S.; Waller v. Liles, 96 Tex. 21, 70 S. W. 17; Continental Casualty Co. v. Chase (Tex. Civ. App.) 203 S. W. 781.

[17] Under the twentieth proposition it is urged if appellees were entitled to one-half of the oil produced they should have been charged with $5,000 paid them by the receiver upon the order of the court. As we view the matter, the account of the receiver and a settlement with him is not properly before us. It seems to have been the purpose in the trial court to establish the amount due for expenditures by appellees in operating the wells while under their control, and after the wells were cleaned. That amount, when established, would be allowed, we presume, by the receiver, upon proper presentation to him. The amount paid out by him on the order of the court will be properly disposed of upon the settlement with the receiver. It does not seem to us to be properly an issue in this case, as the receiver is not a party to this action.

[18] The twenty-first proposition complains of the judgment of the court in allowing interest on the $4,250 advanced on the written contract. The trial court presumably instructed a verdict for appellant on this contract on the theory that the contract was not made by a majority of the trustees or rati-

fied by them. We were and are yet of the opinion, under the circumstances of this case, and under the view entertained by the court, the money so paid the company and used by it should be treated as money had and received on the contract. The failure to return the money paid would not necessarily work a ratification, where the contract is promptly rejected by the company upon learning of its execution and the other party promptly notified. The acceptance of money and the use thereof, without knowledge of the contract, does not work a ratification, but it will, we think, establish the relation of debtor and creditor. Interest would be recoverable under our statutes under the written contract by virtue of which the company obtained the money. Article 4977. There appears to be no specific prayer for interest eo nomine. The facts are alleged in the body of the petition. This, perhaps, was sufficient to allow a judgment therefor. City of Houston v. Lubbock, 85 Tex. Civ. App. 106, 79 S. W. 859. However, this may not be definitely settled by our courts. Butler v. Holmes, 29 Tex. Civ. App. 48, 68 S. W. 52. It will eliminate any question by making the proper plea upon another trial.

The twenty-second proposition assails the judgment for adjudging one-half the costs in the receivership proceedings. The receivership is not properly before us for adjudgment of the costs therein.

The twenty-third proposition is overruled.

[19] The twenty-fourth proposition assails the judgment apparently on the ground that the petition would not authorize a recovery on the oral contract. In so far as this proposition refers to the petition we think it is not well taken. The prayer is set out, and, so far as we can interpret the appellant's position, it is that, because the prayer seeks specific performance, it is only of the written contract and not the oral. This is, we think, rather a strained construction. The oral contract is alleged, as well as its performance. It is the body of the petition to which courts must look for the cause of action. Railway Co. v. Canyon Coal Co., 102 Tex. 478, 119 S. W. 294; Lamar v. Hildreth (Tex. Civ. App.) 209 S. W. 173. As to the findings of the jury we have sufficiently noticed under preceding propositions.

[20] The twenty-fifth proposition is overruled. It is contended by the testimony of C. A. Walling, one of the fee owners of the property in question, with reference to his consulting attorneys about an action against appellant to oust it on the ground that the property was shut down several months, this conversation occurred just before the oral contract. This testimony doubtless was on the issue as to the condition of the property and the necessity for the contract. We believe it to be admissible. Other like testimony was introduced without objection.

[21, 22] The twenty-sixth proposition relates to the testimony of Walling, and part of which shows he examined the books of appellant, and that there was charged thereon $5,000 to abandonment. We are inclined to think this testimony admissible under the issues if the books could not be obtained. The other part of the testimony under this proposition, if segregated, should have been excluded. It relates to the royalty paid the witness by appellant company for the lease, and that appellant was claiming the consideration paid for the lease was $35,000 when the amount paid was less than $16,000. All this testimony we think immaterial and calculated to be prejudicial to appellant.

The twenty-seventh proposition is overruled.

[23] The twenty-eighth and twenty-ninth propositions relate to the letters written by Reid, the secretary, to Irby and Cunningham, mentioned in our statement of the facts. The evidence shows Reid was the secretary and sufficiently shows he wrote the letters. It is apparent he was in the performance of his duties as secretary in writing them. The letters were not sufficient to bind the company on the oral contract, as he had no such authority, but they are part of the res gestæ and form part of the negotiations and are circumstances which may be looked to, in connection with other evidence, for the terms of the contract. We do not think they are the acts of another in such sense as will exclude them. They are, in fact, part of the transaction occurring at the time. Horton v. Reynolds, 8 Tex. 284; Memphis Cotton Oil Co. v. Goode (Tex. Civ. App.) 171 S. W. 284, and authorities cited.

The thirtieth proposition will be overruled. The letter of which objection is made is from Staley to appellees, relating to the written contract. It was perhaps relevant in connection with that transaction, at least in so far as Staley was concerned, while it would not bind others not responsible for the statements therein. As the court directed a verdict against the written contract, no injury could have resulted.

The thirty-first proposition is overruled.

[24] The thirty-second proposition as to the admission of Cunningham's testimony to the effect that one Roberts came to the well, while he was at work cleaning out the wells, and wanted to buy him out; that Roberts was associated with Davis in a well across the street from the wells in question; that Cunningham would not sell because it would not be using the trustees' right, as Staley had told the witness before that he (Staley) had refused to sell to stockholders. The particular objection urged does not seem to us to present a reason for reversal. It is our view, however, the testimony should not have been admitted unless it be shown that Roberts was acting for Davis, or for the joint interest of Roberts and Davis, or at the instigation of Davis or some of the other

trustees. The admission of the evidence, we think, was not so prejudicial as to require a reversal, but upon proper objection should be excluded as being immaterial and calculated unduly to prejudice the rights of appellant.

The thirty-third proposition is overruled. Under the issues in this case the evidence was admissible. The petition, it is true, did not itemize expenditures of labor, work, and material on the well. We think, however, the allegation is sufficient in the absence of a special exception to admit the item of which objection is here urged. The other objections go more to its weight than its admissibility.

The thirty-fourth proposition will be overruled. We do not think the witness, to whose testimony objection is made, was stating a mere opinion or conclusion; but it would appear rather that he was rendering a shorthand statement of the fact.

The thirty-fifth proposition asserts there was no estoppel shown, etc. The pleadings and evidence present the question of ratification. There are phases of this case which we believe present estoppel; but we will not discuss the evidence on that phase, as we have pointed out the marks of distinction between the two, ratification and estoppel, and the authorities where the rules of law may be found with reference thereto. The facts showing ratification may also present estoppel. We believe it unnecessary to discuss this matter further.

The appellees in their brief present cross-assignments to the action of the court in instructing a verdict against them on one-half interest in the property claimed by them under the written contract, set out in the petition; in refusing a requested instruction for a verdict for all the property under the written contract; and in overruling their motion for a judgment based on the findings of the jury to the written contract.

[25] The cross-assignments were not filed in the trial court and brought up with the record. Under the rules, unless appellant agreed that they may be considered we are not authorized in doing so. In this case appellant strenuously objects to their consideration. Rule 28 for Courts of Civil Appeals (142 S. W. xii), and Rule 101 for District Courts (159 S. W. xi). Guaranty State Bank v. Hull (Tex. Civ. App.) 165 S. W. 104 (6); Ross v. Moore (Tex. Civ. App.) 191 S. W. 853 (6); Eldora Oil Co. v. Thompson (Tex. Civ. App.) 230 S. W. 738 (8). Therefore no errors will be considered but such

as are fundamental and apparent of record. Hamilton v. Kegley, 57 Tex. Civ. App. 159, 122 S. W. 304. If there were six trustees at the time of drafting and signing the written contract by the three trustees signing them, a majority, as required by the articles of association, did not sign them. If the three others ratified it, this is a question of fact to be ascertained by the evidence and circumstances of the case. Estoppel as to the company is also one of fact. This would not, as we understand, present fundamental error apparent of record. We cannot say the court should have instructed a verdict for appellees on the written contract or that he erred in instructing for appellant on this point. The testimony of the appellees and others, it may be proper for us to state at this time, suggests that the contract was not to be effective or delivered by the association until the other three trustees or a majority of them should sign it, and that the cash payment was made with that understanding. Whether conclusive or not we do not undertake to say. It is urged that judgment should have been rendered on the findings of the jury; that Davis, Hill, and Scruggs had failed and refused to act in their trust capacity on request prior to making the written contract. This was not a finding they had failed and refused to act after the writing, or does it necessarily negative they were the trustees of the association. If they should fail and refuse it does not necessarily create a vacancy in the office. It may be a circumstance tending to prove the fact. 3 Fletcher, Cyc. Corp. § 1810, p. 3004.

"The absence of a director from the state or a continued failure to attend meetings, etc., where there has been no resignation, does not have the effect of vacating his seat, unless there is some express provision to that effect. Mere absence of directors from several or any number of meetings of the board does not of itself terminate their term of office." 3 Fletcher, Cyc. Corp. 1805, p. 2998.

We are unable to say there is fundamental error in the matter of which complaint is made by cross-assignments, and for that reason we decline to pass further upon them.

The judgment of this court heretofore entered affirming this case will be set aside and the opinion thereon handed down withdrawn. The motion for rehearing is granted, and for the errors pointed out the judgment of the trial court will be reversed, and the cause remanded for another trial.